Stort,
 
 J.
 

 delivered the opinion of the Court as follows ;
 

 , The first question presented in this case is, whether the Court ha* jurisdiction. The Plaintiffs claim under .a grant from the state of Vermont, and the Defendants claim under a grant from'the state of New Hampshire, made at the time when the latter state, comprehended the whole territory of the former state. The constitution of the United States, among other things,, extends the judicial'power of the United States to controversies between citizens of the same state claiming lands undec grants of different ’states.” it is argued that the grant under which the Defendants claim is not a grant of. a different state within the meaning of tlie constitution, because Vermont, at the time of its emanation was not a distinct government, but was included in the same sovereignty as New Hampshire.
 

 But it seems to us that there is nothing in this objection. The constitution intended to secure anr impartial tribunal for the decision of causes arising from the. grants of different states 5 and it supposed that a' state tribunal might not stand indifferent in. a controversy wlr re the claims of its own süv¡ reign were in conflict with those of another sovereign. It had no reference whatsoever to the antecedent situation of the territory, whether included- in one sovereignty of another;. It simply regarded the fact whether grants/arose under the same or under different, states. No'W,'it is ver^' clear tháíí although the territory of Vermont was once, a part of New Hampshire/ yet the state of Vermont, is its
 
 *323
 
 sovereign capacity,, is not, and never was the same as" the state of New Hampshire. The grant of the Plaintiffs emanated purely and exclusively from the sovereignty of Vermont,* that of the Defendants purely and exclusively from the sovereignty of N<w Hampshire. The sovereign power of New Hampshire remains the same although it has lost a part of its territory; that of Vermont never existed until its territory was separated from the jurisdiction of New Hampshire. The circumstance that a part of the territory or population was once under a common sovereign no more makes the states the same, than the circumstance that a part of the members of one corporation constitutes a component part of another corporation, makes the corporation the same.. Nor can it, be affirmed, in any correct sense, that- the grants are of the same state; for. the. grant
 
 of the Defendants
 
 could not. have been made by the state of Vermont, since that state had not at that time any legal existence,* arid the grant of the Plaintiffs could not have'been made by New Hampshire, since, at that- time, New Hampshire had no jurisdiction or sovereign existence by the name of Vermont. The case, is, therefore, equally within the letter and spirit -of the clause ortho constitution. It would, indeed, have been a sufficient answer to the objection, that the constitution and laws of the United States, by thé admission of'Vermont into the union as a distinct government, had decided that it was a different state from that of New Hampshire.
 

 The other question which has been arguéd is npi without difficulty. It is contended by thé Plaintiffs that thé original grant, in the charter of Pawlet, of «one «.share for a glebe for the church of England as by law « established,” is either void for want of a grantee, o,r if it could take effect at all, it was as.a public reservation, which, upon the revolution, devolved upon the state of Vermont.
 

 .The material words of the royal charter of 1761 are,. « do give and grant in equal shares untó our loving sub«jeets. &c. their heirs and assigns forever, whose names « are entered on this grant, to be divided-amongst them «into sixty-eight equal shares, all that tract or parcel « of land, &c. and that the same be and hereby is incor
 
 *324
 
 ««porated into a township by the name of Pawlet; -and “ the inhabitants that do or shall hereafter inhabit the •> said township, are hereby declared to be infra nohised “ with and entitled .to all and every the privileges and ‘• immunities that other towns within our province by “ law exercise and enjoy. To have and to hold the “ tract, of land, &c. to them and their respective heirs « and assigns forever, upon the following conditions,” &c.
 

 Upon the charter ate endorsed the names of
 
 sixty-two
 
 persons, and then follows this additional clause; “ His excellency, Henning Wentworth, a tract of land “ to contain 500 acres as marked in the plan B. W- “ which is to be accounted two
 
 shares;
 
 one share for «« the incorporated society for the propagation of the ««gospel in foreign parts; one share for a glebe for the ««.church of England as by law established ; one share ««for the first settled minister of the gospel; one share «for the benefit of a school in said town.” Thus making up, with the preceding sixty two shares, the whole number of sixty-eight shares stated in the charter. ’ . '
 

 Before we proceed to the principal points in controversy, it will be proper to dispose, of those vvhich more immediately respect the legal construction of the language of the charier. And in our judgment, upon the true construction of .that instrument, none of the granr tees,- saving governor Wentworth, could legally take more than one.single, share, or . a sixty-eighth part of. the' township. This construction is conformable to the letter and obvious intent of the grant, and, as far as we have any knowledge, has been uniformly adopted in New Hampshire. It is not for this Court upon light grounds or ingenious and artificial reasoning to disturb a construction which-has-obtained so ancient a sanction, and-has settled So many titles, even if it were at first somewhat doubtful. But it is not in itself doubtful; for if is the only construction which will give full effect to all the words of the charter. Upon any other, thei words “ in equal shares,” and ««to be divided amongst them in sixty-eight equal shares,” would be nugatory or senseless. We are.further of opinion that the share for a glebe is not vested in the other grantees having á capacity to take, and so in the nature of a condition,
 
 *325
 
 use, or trust, .attaching tp the grant. It is no where staled to lie a condition binding upon such proprietors, although other conditions are expressly specified. Nor is'it a trust or use growing out of the sixty-eighth part granted to the respective proprietors, for it is exclusive of these sitares by the very terms of the charter. The grant is in the same, clause with that to the' society for the propagation of the gospel, and in the same language, and ought, therefore, to receive the same construction, unless repugnant to the content, or manifestly requiring a different one. It is very clear that the society for Jie propagation of the gospel take a legal, and not a. merely equitable estateand there would be no repugnancy to the context, in considering the glebe, in whomsoever it may be held to vest, as a legal éstate.
 

 We are further of opinion that the three shares in the charted- “ for a glebe.” “ for the first settled minister,”. and “ for á school,” are to be read in connexion, so/as to include in each the words “ in the said town,” i. e. of Pawlet; so that the whole clause,is to he construed, on,e share for a glebe, &c.
 
 in the town of Pawlet,
 
 one share for the first settled minister
 
 in the town of Pawlet,
 
 and one share for a school
 
 in the town of Paw-let.
 

 We will now consider what is the legal operation op such a grant at the common law; and how far it is affected by the laws of New Hampshire or, Vermont.
 

 At common law the church of England, in its aggregate description, is not deemed a Corporation. It is in* deed one of the great estates of the realm; but is no' more, on that account, a corporation, than tiie nobility in their collective capacity. The phrase, ‘¿the church of England,” so familiar in our laws and judical treatises, is nothing more than a compendious expres: sion for the religious establishment of the realm, considered in the aggregate under the superintendance of its spiritual head. In this Sense the church of England is said to have, peculiar rights and privileges, notas a corporation, but as an ecclesiastical institution under the patronage of the state. In this sense it is used in magna chacta, chi 1, where it is declared «
 
 quod ecclesia anqli- ** cana libera sit, et habeat omnia jura &uá integra’, el ti-
 
 
 *326
 

 “ deviates suas illwsas;’?
 
 and lord Coke, in Ms comnientary on the'text, obviously so understands it, 2
 
 Inst.
 
 2, 3. The argument, therefore, that supposes a donation to “ the church of England,” in its colhctive capacity,' to be good, cannot be supported, for no such corporate body exists even in legal contemplation.
 

 But it has been supposed that the.« church of En- « gland of a particular parish,” must be a corporation for certain purposes, although incapable of asserting its rights and powers,‘except by its parson regularly inducted, And in this respect it might be likened to certain other aggregate corporations acknowledged in law, whose component members are civilly dead, and whose, rights may lie effectually vindicated through their- established head, though during a vacancy of the headship they remain inert; such are the. common law corporations of abbot and convent, and prior and monks of' a priory. IN or is this supposition without the countenance of authority.
 

 The expression, parish church, has Various significations. It is applied sometimes to a select body of Christians forming a local spiritual association; and sometimes to the building in which the public worship of the inhabitants of a parish is
 
 celebrated;
 
 but the true legal notion of a parochial church is a consecrated place, having attached to it the rights of burial and the administration of the sacraments.
 
 Com. Dig. Esglise, C. Seld. de Decim. 265.
 
 2
 
 Inst.
 
 383. i
 
 Burn’s Eccles. law,
 
 217. 1
 
 Woodes,
 
 314,. Doctor Gibson, indeed, holds that the church in consideration of law is properly the cur© of souls, and the right of tithes’.
 
 Gibs.
 
 189. 1
 
 Burn’s Eccles. law,
 
 232.
 

 .Every such church, of common right, ought to have a
 
 manse and glebe'
 
 as a suitable endowment; and without such endowment it cannot be consecrated; and until consecration it has ho legal exist* nee as a church. Com.
 
 Dig. Dismes, B.
 
 2. 3
 
 Inst.
 
 203.,
 
 Gibs.
 
 190. 1
 
 Burn’s Eccl. law,
 
 233. Com.
 
 Dig. Esglise, A. Dort. of Plural,
 
 80 When a church has Urns acquired all the ecclesiastical rights, it becomes irt the language of law a rectory or parsonage, which consists of a glebe, tithes and oblations established for th’e maintenance of a par*
 
 *327
 
 sbn'or rector to Have cure of squIs within the parish.
 
 Com. Dig. .Ecelesiast. persons, f C. 6. J
 

 These capacities, attributes and rights, however, in order to possess a legal entity, and much more to be susceptible of a-legal perpetuity, must’he invested in some natural or corporate, body; for in no other way can they be exercised or vindicated. And so -is the' opinion of lord C-oke in 3
 
 Inst.
 
 201, 202, where he says, “albeit they” (i. e. subjects) “might build churches “ without the king’s license, yet they could not erect- a “ spiritual politic body to continue in succession and “ capable of endowment without the king’s license ; but. “ by the common law before the statute of Mortmain “ they might have endowed the spiritual body once in- “ corporated
 
 perpetms fuluris temporibns,
 
 without any 11- « cense from the king or any other.”
 

 This passage points clearly to the necessity of a spiritual corporation to uphold the rectorial rights. We shall presentlysee whether tlx1 parish church, after consecration, was deemed in legal intendment s.iCh a corporation. in his learned treatise on tenures, ford chief baron Gilbert informs us that anciently, according to the superstition of th° age.
 
 abbots
 
 ami
 
 pretales
 
 “ were “ supposed to be married to the church, in as much as “ the
 
 right of property was vested in the church,
 
 the es«tate'being appropriated, and the bishop and abbot as “ husbands and
 
 representatives of the church had the right
 
 “
 
 of possession
 
 in them ; and this the rather because they “ might maintain actions and recover, and hold Courts « within their manors and precincts as the entire own- “ ers ; and that crowns and temporal states might have “ no reversions of interests in their feuds and donations. «Therefore, since they had the
 
 possession ip fee,'they
 
 “ might alien in fee; but Jhey could not alien .more than «the right of possession that was in them, for the' right “ of propriety was
 
 in the church.”
 
 But as to a parochial parson* “ because the cure of souls was only com- « mitted to Him during life, he was not capable of a fee, “ and, therefore, the fee was in abeyance.”
 
 Gilb. Tenures, 11
 
 0, &c.
 

 Conformable herewith is the-doctrine of - Bracton, who observes that an assize
 
 juris utrum
 
 would not lie
 
 *328
 
 in cases of a gift of lands to cathedral and conVcntpal churches, though given in
 
 liberam eleemosynam,
 
 because they were not given
 
 to the church solely,
 
 but also to a parson to be held as a barony,
 
 non solum dantur eccksiis, sed■ et personis tenemioe in baronía;
 
 and, therefore, they might have all the legal remedies applicable to a fee. lie say6 it is otherwise to a person claiming land in right of his church, for in cases of parochial churches,
 
 gifts were not considered as made to the parson, but to the church, quia ecclesiis parochialibus non ft donatio persones, sed ecdcsice, secundum perpemli poterit per modum donationis. . Bracton,
 
 286, 6. 1
 
 Reeves Hist, law,
 
 369, And in another place, Bracton, speaking of the modes of acquiring property, declares that a donation may well be made to cathedrals, convents, parish churches and religious personages,
 
 poterit etiaiii .donatio fieri in liberam eleemosynam, sicut ecclesiis cathedralibus,
 
 convenlualibus, parochialibus,
 
 vivis religiosis,
 
 &c.
 
 Bracton,
 
 27,
 
 b.
 
 1
 
 Reeve Hist. law, 303.
 

 The language of these passages would seem to consider cathedral, conventual, and parochial churches as corporations of themselves, capable of holding lands. But upon an attentive examination it will be found to be no inore than an abreviated designation of the nature, quality and tenure of different ecclesiastical inheritances, and that "the real spiritual corporations, which are taciily referred to, are the spiritual heads of the particular church, viz. the bishop, the abbot, and, as more important
 
 to
 
 the present purpose, the parson,
 
 qui gent person-am eedesim.
 

 Upon this ground it lias been held in the year books, 11
 
 If.
 
 4, 84,
 
 b,
 
 and has been cited as good law by Fitzherherl and Brook. .(Fitz:
 
 Feofft. pl. 42.—
 
 Bro.
 
 Estate pl.
 
 49,
 
 S. C. Finer, ab. L. pl.
 
 4.) that if a grant bo made to the church of such a place, it shall be a fee in the parson and his successors.
 
 Siterre soit done per ceux parolee, dedit'et'concessit ecclesiis de tiel lien, leparson etses snccessen rs serra inker iter.
 
 And in like manner if a gift, be of chattels to parishoners, who are no corporation, it is good and t!ie church wardens shall take them in succession, for the gift is to. the use of the church. 37 H. 6, 30 — 1
 
 lújd. Corp.
 
 29. '
 

 
 *329
 
 in. other cases the law looks to the substance of the gilt, and in favor of religion, vest sit in the party capable of taking it. And notwithstanding the doubts of a learned, but singular mind,
 
 Ferk.
 
 § 55, in our judgment the grant in the present charter, if there had been a church actually existing in Pawltt at the time of the grant. must, upon the common law have received the same construction. In the intendment of Jaw the parson and his successors would have been the representatives of the church entitled to take the donation of the glebe. It would in effect have been a grant to the parson of the church of England, in the town of Pawlet, and to his .successors, of one share in the township, as an endowment to be lie Id
 
 jure ecclesice;
 
 for a glebe is emphatically the dowry of the
 
 church; Gleba cst terra qua consistit dos ecclesice. Lind.
 
 254.
 

 Under such circumstances, by the common law, the existing parson would have immediately become seized of the freehold of the globe, as a sele corporation capable of transmitting the inheritance to his successors.
 

 Whether,
 
 during his lif :,
 
 the fee would he in abeyance according to the ancú nt doctrine
 
 (Litt.
 
 § 646, 6
 
 47.—Co.
 
 Lit. 342.
 
 5
 
 Ed
 
 w.
 
 4,
 
 405.
 
 —Byer
 
 71. pi. 43.
 
 — Mob. 338.—
 
 Coni/ Big. Abeyance A. Id. Ecclesiastical persona,
 
 C.
 
 9.
 
 — Fork. §
 
 709,)
 
 or whether, according (o learned opinions in modern times, the fee should bo considered as
 
 ipuudam modo
 
 vested in the parson for the benefit of his church and ids successors,
 
 f Co. Lit.
 
 341,
 
 a. Com.
 
 Dig.
 
 .Ecclesiast. persons, C. 9.
 
 — Fearne,
 
 coni,' rem. BIS, 8pc. Christian’s note to
 
 2
 
 Black. Com.
 
 107,
 
 note 3.
 
 — Gitb.
 
 tenures US.
 
 1
 
 TFoodeson
 
 312,J is not very material to to be
 
 settled;
 
 for at all events the. whole fee would have passed out of the crown.
 
 Lilt..
 
 §
 
 648.
 
 — Cc;
 
 Lit.
 
 341,
 
 a, Christian’s note ubi supra. ,Gilb. tenures
 
 113. Nor would it be in tho power of the crown, after such a grant, executed in the parson, to resume it at its pleasure, it would become a perpetual inheritance of the church, not liable, even during a vacancy, to be divested; though by consent of all parties interested, viz : the patron, and ordinal), and also the parson if the church were full, it ' might be aliened or encumbered.
 
 Lett.
 
 § 648.
 
 Co. Lit.
 
 343.
 
 Ferk.
 
 § 35. — -1
 
 Burn’s
 
 ecclesiast.
 
 laxv
 
 5Si<
 

 
 *330
 
 But in as much as there was not any church dulyconsecrated and established in Pawlet at the time of the chaiv ter', it becomes necessary further to enquire whether, at common law,' a grant so made, is wholly void for want of a corporation having a capacity to take.
 

 In general no grant can take effect unless there be a Sufficient grantee then in existence. This, in the case of corporations, seems pressed yet further; for if therebean aggregate corporation, having a head, as a mayor and commonalty, a grant or devise made to the corporation during the vacancy of the headship is merely voidj although for some purposes, as for tlie choice of a head, the corporation is still considered as having a legal entity, 13
 
 Ed,
 
 4, 8. IS
 
 Ed.
 
 4, 8,
 
 Bro. Corporation, 58,
 
 59.—
 
 Malison, IL
 
 31. — :!
 
 ICydl Corp.
 
 106,
 
 107,
 
 — -Perk. $ 53, SO. Whether this doctrine has been applied do parochial churches during an avoidance has not appeared 'in. any authorities that have fallen within our notice / and perhaps can be satisfactorily settled only by a rccurrenc® to analogous principles, which have been applied to the original endowments of such churches.
 

 We have already seen that no parish church, as such, could,have a legal existence until
 
 consecration;
 
 and consecration was expressly inhibited unless upon a suitable endowment of land. The cannon law, following the civil law, required such endowment to be made or at least ascertained, before Die building of the church wa* begun.
 
 Gibs. 189.
 
 — 1
 
 Burn’s Modes, law,
 
 233. This endowment was in ancient, times commonly made- by an allotment'of
 
 vwnse and glebe,
 
 by the lord of the manor, who thereupon became the, patron of the church. Other • persons also at,the time of consecration often contributed small portions of ground, which is the reason, we are-told, why, in England, in many parishes, the glebe is not only distant from the manor, but lies in remote, divided, parrels,
 
 Ken. Par. Autx
 
 222,
 
 223,£ited in 1 Burn’s, Modes, law,
 
 284. The manner of founding the church and making the- allotment was for the bishop or his commissioner to, set up a cross and -set forth the ground wlvre the church was to be built, anti it then became the endowment of the church.
 
 Doggo, p.
 
 1,
 
 oh,
 
 12,
 
 cited
 
 1
 
 Burn’s, Modes, law,
 
 233.
 

 
 *331
 
 From this brief history of the foundation of parsonages and churches, it is apparent that there could be no spiritual or other corporation capable of receiving livery of seizin of the endowment of the church. There could be no parson, for he could be inducted into office duly as a parson of an existing church, and .the endowment must precede the establishment thereof. Nor is it even hinted that the land was conveyed in trust, for at this early period trusts were an unknown refinement. The land therefore must have passed out. of the donors, if at all, without a grantee, by way of public appropriation or dedication to pious uses. In this respect it would form an exception to the generality of the rule, that to make a grant valid there must be a person
 
 in esse
 
 capable of taking it. And under such circumstances, until a parson should be legally inducted to such new church, the fee of its lands would remain in abeyance, or belike the
 
 hear editas jacens
 
 of the Roman code in expectation of ».n heir. This Would conform exactly to the doctrine of the civil law, which, ás to .pious donations, Brae ton has not scrupled to affirm to be the law of England.
 
 Res vero sacres, religiosos,, et sonetee in nullius bonis sunt, quod enim divini juris est, id in nullius hominis bonis est, immo in bonis dei hominum censura, Spc. Res quídam nullius dienntur ■ pluribus modis, $v. ' Item censura (ut dictum est,) sicut res sacres religiosos et sonetee.. Item casu, sieut est' hoereditas jacens ante addiiionem, sed fallit in hoc, quia oustihet vicem persones defunvti, vel quia speratur futura hoereditas ejus, qui ádibit. Bracton,-8, a. Juslin. in, stit. lib.
 
 2,
 
 tit. 1.
 
 — Co.
 
 Lit.
 
 342.. on
 
 Lilt.
 
 § 447.
 

 Nor is. this a novel doctrine in the common law. In the familiar case where'a man lays out a public street or . highway, there is, strictly speaking, no grantee of the easement, but it takes effect by way of grant or dedication to public uses.
 
 Lade v. Shepherd.,
 
 2
 
 Str.
 
 1004.
 
 Hale in Harg. 78.
 
 So if the parson or a> stranger, purchase a bell wit,h his own money and put it up, the, property passes from the purchaser, because, when put up, it is consecrated to the church, 11
 
 H
 
 4, 12, 1
 
 Kyd. Corp.
 
 29, 30. These principles may seem to savour of the ancient
 
 law;
 
 but in a modera case in which, in argument, the doctrine was asserted, lord Hard wicke. did not deny it, biit simply decided that the circumstances of that case did not amount to a donation of the land, on which
 
 *332
 
 a chappel had been built, to public and pious uses. .At
 
 torney General v. Foley,
 
 1
 
 Dick. R.
 
 363. 'And in an intermediate period, lord chiefjustice Dyer held tliat if the .crown by a statute renounced an estate, the title was gone from the crown, although not vested in any other person, but the fee remained in abeyance.
 

 [t is true that Weston,
 
 J.
 
 Avas, in thé same case, of 'a different
 
 opinion;
 
 but lord chief baron Comyns,has quoted Dyer’s opinion ¿without any mark of disapprobation.
 
 Com. Dig. Meyanee, Jl.
 
 1.
 

 For the reasons then that have been stated, a donation by the crown for the use of a non-existing parish church, may well take effect by the common law as a dedication to pious uses, and the crown would thereupon be deemed the patron of the future ben--fice when brought into life. And after such a donation it would not be competent for the crown to resume it at its own will, or alien the property without the same consent which is necessary for the alienation of other church property, vis: the corisrnt of the ordinary, and parson, if the church befall, or in a vacancy, of the ordinary alone.
 

 And the- same principles would govern the case before the Court if it were to be decided upon the mere footing of the common la\y. ' If the charter had been of a township in England, the grant of the glebe, wouid have taken effect as a dedication to the parochial church of England to be established therein.
 

 Belore such church were duly erected and consecrated the fee of the glebe would remain in abeyance, or at least be beyond the power of the arown to alien without the ordinary’s consent. Upon the erection and consecration of such a church 3ml the regular ind .ction of a parson, such parson and his successors would, by operation of law and without further act, have taken the inherUancc jare
 
 ecelesice.
 

 I,et us now see liow. far these principles were applicable to New Hampshire, at the time of issuing of the charter of Pawlet.
 

 New Hampshire was originally erected into a royal
 
 *333
 
 province-in the 31st year of Charles 2d, and from thence until the revolution, continued a royal province, under the immediate control and direction, of the crown. By the firstroyal commission granted in 31, Charles 2, among other things-judicial powers, in all actions, were grant-e,d to the provincial governor and council, « so "always “ that the form of proceedings in such cases, and “judgment thereupon to be given, be as consonant and
 
 “
 
 agreable to the,laws and statutes of this our realm of
 
 “
 
 England,- us the present state and condition of our sub-ejects inhabiting within the limits aforesaid (i. e. of the
 
 ‘
 
 province) and the circumstances of the place will ad■■"mit.” Independent, however, of such a provision, we. take it to be a clear principle that the common law in force at the emigration of our ancestors is deemed (be birth right of the colonies unless so far as it is inapplicable to their situation, or repugnant to their other rights 'and privileges.
 
 J1 fortiori,
 
 the principle applies to a royal province.
 

 By the same commission or charter the crown granted to the subjects óf the province, “ that liberty of con- « science4 shall be .allowed to all Protestants,' and that
 
 “
 
 such especially as shall be conformable to the rites of «the church of England shall be particularly countenanc«ed and encouraged.” By a subsequent commission of 15
 
 Geo.
 
 2, the governor of-the province among other things, is authorized «to collate any person.or persons
 
 e‘
 
 to any churches, chappels, or other ecclesiastical bene- “ fices, within our said province, as often as any shall « happen terbe void,” and this authority was continued and confirmed in the same terms by royal commissions,
 
 in
 
 1
 
 Geo,
 
 3,
 
 and
 
 6
 
 Geo.
 
 3.. By the provincial statute of 13
 
 Jinn, ch.
 
 43, the respective towns in the province were authorized to choose, settle and maintain their ministers, and to levy taxes for this purpose, so always that no person wiio constancy and conscientiously attended public worship according to another persuasion should be excused from taxes. And the respective towns were further authorized to build and repair meeting houses, minnister’s houses and school houses, and to provide and pay school-masters. This is the whole of the provincial and royal legislation upon the subject of religion.
 

 In as much as liberty of conscience was allowed and
 
 *334
 
 tlie church of England wa3 pót exclusiyely' established, the ecclesiastical rights to tithes, oblations arid other dues >had no'legal, existence in the. province.' Neither, upon tlie establishment of churches, was a consecration by the bishop, or a presentation of a parson to the ordinary, indispensible,- for no bishopric. existed within the province.
 

 But the common law so far as it respected the erection of churches of the'Episcopal persuasion of England, the right to present, or collate to such churches, and the corporate capacity of the parsons thereof to take in succession, seems to have been fully recognized and adopted. It was applicable to the situation of the province,' was avowed.in the royal grants and commissions, and explicitly referred to in the.appropriation of glebes, in almost all the charters of townships in the province.' Arid it-seems to be also clear that it belonged bo the crown ex-fclusively, at its own pleasure, to erect the church in each town that should be entitled to take the glebe, and uport such erection to collate, through the governor, a parson to the benefice. The respective towns in their corporate capacity had no control over the
 
 glebe;
 
 but in as much as they were bound, by the provincial statute, to maintain public worship, and had therefore an interest to be eased of the public burthen, by analogy to the common law-in-relation to the personal property of the parish church, the glebe could not, before the erection of .a church, be aliened by the crown without their
 
 consent;
 
 nor after tlie erection of a church and induction of a parson, could the glebebe aliened without the joint consent of the crown as patron, the parson as
 
 persona ecclesicie,
 
 and the parishonefs of tlie'church as having a temporal as well as spiritual interest, and thereby in effect representing the ordinary.
 

 But a mere voluntary society of Episcopalians within a town, unauthorized by the crown, could no more entitle themselves, on account of their religious tenets, 'to the glebe, than any other society worshiping therein.
 

 The church entitled, must be a church recognized in Saw for this particular purpose. Whenever therefore, Within the province, previous to the revolution, an Episcopal church was duly erected by the crown, in any town,
 
 *335
 
 the parsons thereof regularly inducted had a right to the glebe in perpetual succession. Where no such church was duly erected by the. crown, the glebe remained as an
 
 hcereditas jaqens,
 
 and the state which succeeded tp the rights of the crown, might,, with the assent of the town, alien or encumber it j or’’might erect an Episcopal church therein, and Collate, either directly, or the voté of the town, indirectly, its parson, who would thereby become seized of the glebe
 
 jure ecdesice,'
 
 and be a corporation capable of transmitting the inheritance.
 

 Such in our judgment are the rights and privileges of the Episcopal churches of New Hampshire, and the legal' principles applicable t'o the glebes reserved in the various townships of that state previous to the revolution. "And without an adoption of some of the common law in the manner which I have suggested, it seems very difficult to give full effect to the royal grants and commissions, or to uphold that ecclesiastical policy which the crown. had a right to patronize and to which it so explicitly avowed its attachment.
 

 It seems to.be tacitly, if not openly, conceded, that before the revolution, no regular Episcopal church was .established in Pawlet. By the revolution the state' of Vermont succeeded to all the rights, of the crown, as to the unappropriated as well as appropriated glebes.
 

 It now therefore becomes' material to surveythe statutes which the state of Vermont has,’ from time to time, passed on this subject.
 

 By the statute of 26th of..Getob.er, 1787, the selectmen of the respective towns were authorized during the then
 
 septenhary
 
 (which expired in 1792,) to take the care and inspection of the glebes and to lease the samfe for,1 and during the same term; and further, to recover possession of the same, where they had been taken possession of by persons without
 
 title;
 
 but an exception is made in favor of ordained Episcopal ministers, who during their ministry within the same term, were allowed to take the profits of the glebes within their respective towns. • Th« statute of SO.th October, 1794, granted to their respective towns the entire property of the. glebes, therein sittiat
 
 f,for the sole use and support of religious-worship
 
 ; and
 
 *336
 
 authorized the selectmen of the towns to lease aPd recover possession of such gleb.es. This act was repoaled by the statute of the 6th of November, 1779. But by the statute of the 6th of November, 1806, the glebes were again granted to the respective towns,
 
 for the use of the schools of such
 
 towns; and power was given to the seto sue for possession of, and to lease the same.
 

 By the operation of these statutes, and especially, of that of 1794, which, so far as.it granted the glebes to the towns, could not afterwards be repealed by the legislature so as to divest the right of the towns under the grant, the towns became respectively entitled to all the glebes situate therein which had not been previously appropriated by the regular and legal erection ol' an Episcopal church within the particular town ; for in such case the towns would legally represent all the parties in interest, viz. the state which might be deemed the patron, and the parish.
 

 Without the authority of, the state, however, they could not apply the lands to other uses than public worship; and in tiiis respect the statute of 1806, conferred a new right which the towns might or might not exercise at their own pleasure.
 

 Upon these principles the Plaintiffs are entitled to recover, unless the Defendants shew, not merely that before the year 1794, there was a society of Episcopalians in Pawlet, regularly established according to the rules of that sect, but that such society was erected by the crown, or the state', as an Episcopal church (i. e. the church of England,) established in the town of Pawlet. For unless it have such a legal existence, its parson cannot be entitled to the glebe reserved in'the present charter.
 

 The statement of facts is not, in this particular, very exact; but it may be inferred from it that the Episcopal society or church was not established in Pawlet previous to the year 1802. in what manner and by what authority it was then established does not distinctly appear. ’ As the title of the Plaintiffs is however
 
 prima facie
 
 good, and the title of the Defendants is not shown to be sufficient, upon the principles which have been stated the Plaintiffs would seem entitled to judgment.
 

 
 *337
 
 There is another view of the subject which if any doubt hung over that which has been already suggested would decide the cause in favor of the Plaintiff's.,. And it is entitled to the more weight because it seems in an alago us cases to have received the approbation and, sanction of the state Courts of New Hampshire, in the various royal. charters of townships in which shares have reserved for public purposes (and they are numerous) it has been held that the shares for tbetirst settled minister and for the Benefit of a school, were vested in the tow» In its corporate
 
 capacity;
 
 in the latter case as a fee simple absolute, in the former case as a base fee, determinable upon the settlement, of the first minister by the town.
 

 The foundation of this construction is supposed tobe that the town is by law obliged to maintain public worship and public schools and that therefore the legal title ought to pass to the town, which is considered as the real
 
 cestui que
 
 use; By analogy to this reasoning the share'for a glebe might be /deemed to be vested in the town for the use of an Episcopal
 
 church;
 
 and-theji before any such church should be established, and the use executed m its parson, by the joint assent of the legislature and the town, the land might at any time be appropriated to other purposes.
 

 We do not profess to lay any particular stress on this last consideration, because we are entirely satisfied
 
 to
 
 vest the' decision .upon the principles wtiieh have been before asserted;
 

 On the whole, the opinion of. the majority of the Court is, that upon the special statement of facts by the parties) judgment ought to pass for the Plaintiffs;
 

 Johnson,
 
 J.
 

 The difficulties in this case appear to me to .arise from refining too'much upon the legal principles relative to ecclesiastical property under the laws of England.
 

 I find no difficulty in getting a sufficient trustee to sustain the fee until the uses shall arise.
 

 It is not material whether the corporation of Pawlet
 
 *338
 
 consist of the, proprietors or inhabitants. The grant certainly vests the legal interest in the proprietor; and it is in nothing inconsistent with this idea to admit that the corporate powers of the town of Pawlet are vested in the inhabitants. The proprietors may still well be held trustees, but the application of the trust may be subject
 
 to
 
 the will of the whole combined population.
 

 1 therefore construe this grant thus, we vest in you so touch territory* by metes and bounds, in trustrto divide the same into sixty-eight shares; to assign one share ih fee tó each of you, the grantees, two to the go-tenor* one to the church of England' as by law established, &c. This certainly would be a sufficient conveyance to support the fee for the purposes prescribed.
 

 But the difficulty arises on the meaning of the words
 
 “
 
 chftrrfi of England as by law established.” This was unquestionably meant to set apart a share of the land granted, for the use of that class Of Christians known by the description of Episcopalians. But was it competent for any man, or any number of men to enter upon this land,, without any legal designation or organization identifying them to come within the description of persons’pfor whose use this reservation wras made? I think not. Some act of the town of Pawlet, or of the legislature of the state, or at least of Episcopal jurisdiction, became necessary to give, form and consistency to the
 
 cestui que
 
 fe* until such person or body became constituted and íécognized. I see nothing to prevent the legislature jtself from making an appropriation of this property.
 

 Their controlling power over the corporate body denominated the totvn of Páwlet, certainly sanctioned such an act; and before the act passed in this case therft does not appear to have been in existence a person', or body of men, in which the use could have vested.
 

 • 1 therefore concur in the decision of the Court.