No. 40,956

LaVerne Dawkins, *Appellee,* v. Reynolds Dawkins; First State Bank, and Body of Christ (Gospel Tabernacle), *Appellants.*

(328 P. 2d 346)

Opinion filed July 7, 1958.

*John J. Ziegelmeyer* and *Cyrus W. Long,* both of Kansas City, argued the cause and were on the briefs for the appellant.

*J. W. Mahoney,* of Kansas City, argued the cause, and *David W. Carson* and *John K. Dear,* both of Kansas City, were with him on the briefs for the appellee.

The opinion of the court was delivered by

Jackson, J.: This was a divorce case in the court below between the wife of a minister and her husband. We have the unusual situation in which the husband's church and a bank which holds a mortgage on certain church property became defendants in the divorce case. It is unusual, but not unheard of in our former cases for third parties to be involved in divorce cases. (*Breidenthal v. Breidenthal,* 182 Kan. 23, p. 28, 318 P. 2d 981, and authorities cited.) The bank and the church became defendants due to the fact that Mrs. Dawkins, the plaintiff, made certain claims upon property standing in the name of the church, and on which the bank holds a mortgage.

The trial court, after a trial which we are advised lasted the better part of two weeks, granted a divorce to the plaintiff wife and gave her custody of two minor children. The court also in awarding alimony and child support made the unusual finding that the minister and the church were one, and in effect, held that all of the church property belonged to the minister. The trial court decreed that a certain building known as the parsonage, located

at 903 Argentine Blvd., Kansas City, Kansas, should be set over and decreed to be the property of the plaintiff wife. The title of this property was and is in the name of the trustees of the church and is covered by a mortgage in original amount of $45,000 which mortgage likewise covers the church building. The trial court likewise set aside for lack of consideration a quitclaim deed made by the wife and husband to the board of trustees of the church covering the parsonage and other church properties to which the wife had made claim in a previous petition for separate maintenance. This deed was executed during an attempted reconciliation between the minister and his wife.

The trial court stated its conclusions in a part of its opinion on page 282 of the abstract reading as follows:

"What is the situation with respect to the operation of this church? There aren't any books worthy of the name prior to the year 1957. The evidence leads me to believe that Reverend Dawkins was answerable only to his conscience in connection with the disbursement of church funds. Now, I think Reverend Dawkins has a conscience; I am not convinced that he made away with church funds. But the fact that he, alone, had the control over them is important in arriving at the true state of affairs in this case.

"With reference to the trustees of the Gospel Tabernacle, the Court finds that this was not a legimately-operating, independent board, but that the board was, in fact, a straw board created by Reverend Dawkins to meet a legal necessity, to-wit: the requirements of the R. F. C. . . .

"Fraud is not the question here. But the deed by which Reverend and Mrs. Dawkins conveyed certain properties to the trustees (Exhibit 36) will be held to be invalid and of no force or effect because (1) no consideration for such deed is shown, and (2) the situation is the same as if Carl Henry Smith, for example, were to sign a deed as Carl Smith, conveying property to himself as Henry Smith. The grantor, R. E. Dawkins (joined by his wife) and the grantee are one and the same, in view of the Court's findings that the trustees simply provided a method by which Reverend Dawkins carried on the business of the Church."

The abstract in this case, including exhibits, runs to the length of some 330 pages. There is also a counter abstract, entirely in the form of questions and answers of 250 pages. The court has been hindered because the pleadings in the case have not been included in either the abstract or counter abstract despite the length thereof. Closer attention should be given to the rules of the court pertaining to appeals. (See Rule 5.)

In this appeal, we are concerned only with the rights of the Gospel Tabernacle of which the Reverend Mr. Dawkins is the pastor.

The church is appealing and asserts that the property of the church has been taken and given to Mr. Dawkins, and that his wife has been allowed alimony therefrom. As will be seen from the above quoted part of the court's opinion, the basis of the court's decision was that the Reverend Mr. Dawkins absolutely controlled the operation of the church and the actions of its board of trustees, and that therefore, since the church was an unincorporated society, Dawkins and the church were one and the same thing. After reading the long record, we would agree with the trial court on most of the facts which show that the pastor of this church was its undisputed leader and guided its policies and its doings; that he was the leading light in its foundation some twenty-seven years ago; that apparently he controlled the action of the board of trustees. It is also true that up until after the flood of 1951, the church had no board of trustees, but the pastor ran the church himself. Mr. Dawkins testified that prior to about 1952, he was sole trustee of the church's property and that the church affairs of the Gospel Tabernacle were carried on in that manner.

We feel that the trial court misconceived the legal position of the pastor under all of the above facts. He was a trustee, a fiduciary, expressly and by operation of law, and while he did exercise complete control, the property was not his own personal property, but the property of the church.

The idea of a sole trustee in the person of the pastor is not new. The Roman Catholic Church has long held property in the name of its bishops as corporation soles. (See *Searle v. Rom. Cath. Bishop of Springfield,* 203 Mass. 493, 89 N. E. 809; Black's Law Dictionary, p. 410.) Likewise, the domination of a board of deacons, a board of elders, or a vestry by the minister is not unknown in Protestant churches. This domination often occurs even when the church is incorporated.

The parsonage and all of the property here concerned, and to which the church now makes claim, stands in the name of the board of trustees of the church. Furthermore, as noted above, the wife released any claim she had been asserting by signing the quitclaim deed covering all of this property at the time of the attempted reconciliation. The unfortunate circumstance that the reconciliation did not work out would not give the court the power to cancel that deed and also the pre-existing title of the church and give the property to the church trustee personally, partially at least, for the benefit of his wife.

The reports of this court are full of cases involving the property rights of unincorporated church societies. None that have come to the court's attention involve the claim of the pastor's wife for alimony in the church property, but all uphold the sanctity of the claim of the religious body as to the property dedicated to pious and religious uses. It makes no difference whether the dedication to such use be made by the public or by the members of the unincorporated society.

In the early case of *Comm'rs of Wyandotte Co. v. Presbyterian Church*, 30 Kan. 620, 1 Pac. 109, Mr. Justice Brewer speaking for the court said:

"It is enough to say, that after a variety of decisions and legislation the law seemed to culminate and be settled by the statute of 43 Elizabeth, chap. 4, (1601,) commonly called 'the statute of charitable uses,' and from that time on the validity of appropriations to such uses was considered a settled thing at the common law. And while in this country that statute as a whole has not been accepted as of force in all the states, yet the principle which underlies it has been universally recognized, at least so far as any question like the one before us is concerned. Thus in *Trustees v. Canal Co.*, 9 Ohio St. 287, the court said:

" 'But one of the earliest demands of every social community upon its lawgivers, at the dawn of its civilization, is adequate protection to its property, and institutions, which subserve public uses, or are devoted to its elevation, or consecrated to its religious culture, and its sepulchres; and in a proper case, the courts of our state might be driven into the recognition of some principle analogous to that contained in the statute of Elizabeth, as a necessary element of our jurisprudence.'

"And in the case of *The Town of Pawlet v. Clark*, 9 Cranch, 332, the supreme court of the United States by Story, Judge, uses this language:

" 'For the reasons then that have been stated, a donation by the crown for the use of a non-existing parish church, may well take effect by the common law as a dedication to pious uses, and the crown would thereupon be deemed the patron of the future benefice when brought into life. And after such a donation it would not be competent for the crown to resume it at its own will, or alien the property without the same consent which is necessary for the alienation of other church porperty.' "

See also our later cases of *Hughes v. Grossman*, 166 Kan. 325, at page 330, 201 P. 2d 670; *Whipple v. Fehsenfeld*, 173 Kan. 427, 249 P. 2d 638; *Kansas Baptist Convention v. Smith*, 178 Kan. 123, 283 P. 2d 503; *Jackson v. Jones*, 130 Kan. 488, 287 Pac. 603; and *United Brethren, Etc., v. Mount Carmel Community Cemetery Ass'n*, 152 Kan. 243, 103 P. 2d 877.

Many of the above cases involve schisms in religious societies. Actually, there has been a schism in the church in this case. The

wife and most of her witnesses were former members of the church who had severed their relations with the church and its pastor because of doctrinal differences. As such former members, they have no right to impair the title of the church property and the fiduciary relation of the pastor of the church to his charge. This court differs with the trial court as to the law to be applied to the facts found by the trial court. Therefore, the portion of the trial court's decree setting aside the deed of March 12, 1957, and in any other manner casting doubt upon any property belonging to the church should be and the same is hereby reversed.

The other portions of the trial court's decision are dealt with in the companion appeal this day decided, see *Dawkins v. Dawkins*, No. 40,957, page 336.

It is so ordered.

FATZER, J., dissenting: Upon a review of the record and the findings of the trial court, I must respectfully dissent.

As the majority opinion indicates, this was an action for divorce by the wife of a minister against her husband. The record is voluminous, the abstract consists of 290 pages; the counter abstract contains 250 pages; the abstract of exhibits contains more than 50 pages, and comprehensive briefs were filed by both parties. The trial consumed some eight days, and numerous witnesses testified for both sides. The plaintiff was granted a divorce for extreme cruelty and that issue is not before us. The principal question concerns the home of the parties at 903 Argentine Boulevard, Kansas City, Kansas, which the trial court awarded to the wife. This dissent concerns only that question.

In its memorandum opinion the trial court stated:

"To support Reverend Dawkins' contention that he owns none of this property is tantamount to cutting Mrs. Dawkins off without anything to show for the years she served him as his wife, and served this church as the pastor's wife. This isn't just, it isn't equitable, and it isn't proper under the evidence. It is argued that the Church doesn't owe Mrs. Dawkins a living, but, as the daughter, Beverly, said, 'Mother has as much in this thing as Dad after twenty-seven years.'

"Title to the real property commonly known and designated as 903 Argentine Boulevard will be ordered deeded to LaVerne Dawkins, and upon the failure of defendants to execute such a deed to the plaintiff, this decree shall stand in lieu thereof. Justice in this case demands that plaintiff have the right to occupy this home which was built for her out of the goodness of the hearts of the members of this congregation. Plaintiff shall be entitled to immediate possession of the premises. . . ."

The defendants filed timely motions for a new trial. On October 3, 1957, the court filed a memorandum opinion overruling those motions, pertinent portions of which read:

"There is only one serious question in this case—the setting apart, by the Court, to plaintiff of the real estate at 903 Argentine Boulevard, the record title to which stood in the names of the trustees.

"It should be remembered that Reverend Dawkins claimed and received credit on his federal income tax return for an $8,500.00 loss on account of the destruction of his home (before the flood) at 1033 Scott Avenue. Plaintiff's testimony, uncontradicted, was that Reverend Dawkins told her the proceeds of this house, when rebuilt and sold, would be used in their new home. *Reverend Dawkins was clearly proven to be lying with regard to the $7,000.00 he took in May, 1955, from the First State Bank loan of that date.* He testified he took this money and paid bills on a structure he had erected in the Kaw Valley near Turner. Rebuttal testimony brought in by plaintiff refuted this testimony beyond question. *This $7,000.00, plus the money from the sale of 1033 Scott Avenue, plus the contributions made in response to Reverend Dawkins' appeal for a home for his wife, more than equalled the cost of 903 Argentine Boulevard.*

"Defendants' counsel argue at length the 'Trust Pursuit Rule.' *Turning the rule around, a tracing of Reverend Dawkins' unquestioned personal funds would prove 903 Argentine Boulevard to be his property and subject to division by the Court in this action,* even if the Court should ultimately be held to be wrong as to some of its other findings and rulings."

On the whole this is a fact case.

The parties were married in 1929 at Hernando, Mississippi; the plaintiff was sixteen and the defendant was eighteen; they are the parents of six children, only two are minors, the twins, born in October of 1955. When married, Dawkins was employed at Sears Roebuck and Company, but in 1931 he returned to his home state of Arkansas to work as a cooper. Soon thereafter he began evangelizing in Leslie, Arkansas, and has successfully pursued that profession for the past 27 years. After traveling around the southeastern part of the country with his tent for some time, Dawkins decided to locate permanently in Kansas City, Kansas. He founded his church in the Armourdale district and began scouring the town for "saints," as he referred to the members of his congregation. The early depression years were difficult. Economically, the Dawkins family was no different from other families in the district. Existence was difficult, as was the founding of his church—leaky roofs, drafty windows and crowded conditions applied equally to the family home as well as to Dawkins' churches. The family existed on what he brought home from the church.

During the war years the economic picture brightened and the purses of the members of the congregation began to fill; jobs became plentiful; wages increased, and Dawkins began to prosper. As more money began to flow in, there was no change in the system of handling the finances of the church. As in the old evangelizing days, all the money collected came into Dawkins' hands; there were no records or books kept.

Dawkins ran the church himself. He was its undisputed leader and dictated the policies and activities. When it became necessary to secure a loan from the R. F. C. to rebuild the church following the 1951 flood, that agency required that a board of trustees sign the note and mortgage to close the loan. Dawkins announced from the pulpit one Sunday morning in July, 1952, that A. J. Poltera, C. A. Hendon (Dawkins' brother-in-law) and himself were standing for election as trustees. By a vote of the congregation Dawkins' selection of trustees was ratified. At that time Poltera was ill and resided in California and since his election he has attended only two or three meetings of the trustees. The result was that while Dawkins had a board of trustees in name, one was his brother-in-law, one was ill in California, and Dawkins continued to dominate the church and run its affairs as in the past, even to the extent of signing Poltera's and Hendon's names to contracts "and things like that."

Neither time nor space will permit detailing the great amount of evidence which reflected Dawkins' domination of the members of his church. However, a few incidents are selected from the testimony to demonstrate that dominance and his ability to secure money from the congregation by his eloquent and moving pleas. There was evidence that Dawkins procured group life insurance for the members of his church and stated he should be named as the beneficiary; that when one member wanted to name her mother as beneficiary, she was advised that if Dawkins or the Tabernacle or a member of his church was not made the beneficiary the policy would be worthless, and upon inquiry at the company office she was advised that no such rule existed; that members of the church were not to leave on trips or vacations unless they told him of their plans and made their tithes in advance, and if they disobeyed him in any regard he would say "judgment was going to fall on them, and they would die a horrible death," which statement, and others of similar import, would be made from the pulpit "so that usually

they (the members) knew who he was talking about"; that if Dawkins did not like what some were doing with respect to buying a new automobile or a new home a distance away from the church, he would castigate them from the pulpit, and that he told members of the congregation to sell their jewelry and mortgage their property and give the money to the church. Further, Arnold Leach, the assistant pastor, testified that one of the fundamental doctrines Dawkins preached to his congregation was based upon St. Matthew 6, verses 1 to 4, which was,

"Not to blow a trumpet in your alms, but not to let your left hand know what your right hand doeth, but these things that are done in secret the Lord will reward you openly."

There was evidence that as many as five collections would be taken at one service and that in addition to their contribution in church, members placed money in Dawkins' hand as he stood outside the church after services, amounting to $100 at times, sometimes $50 and sometimes $25. The members did not want a witness of their gift, they gave it freely. Services were held three nights a week and on Sunday, so there were at least four occasions when offerings were taken during each week. In addition, there were extra or special offerings to which the members contributed, such as Dawkins' trip to Europe, and to build a home for Mrs. Dawkins as hereafter detailed.

As Dawkins began to prosper, he commenced to deal in real estate. He purchased properties throughout the city and resold them on optional contracts. In some instances he would take title to the property himself; at other times title was taken in the name of him and his wife, and on still other occasions title would be placed in the name of some trusted member of the congregation. When the properties were rented, all rents were paid to Dawkins in cash. If the property was sold on optional contract, monthly payments were made to Dawkins which he did not share, and when the purchase price was paid in full, deeds would be executed to the purchaser, and, if the title was in the name of a member of the church, he would, at Dawkins' direction, execute a deed.

A search of the record does not indicate when Dawkins purchased the 903 Argentine Boulevard lots where the home was built, or why title was placed in the name of the trustees. There was evidence that on September 4, 1952, a deed was executed in their favor.

During the summer of 1952 while Reverend and Mrs. Dawkins

were at Shepardsville, Kentucky, Mrs. Dawkins became very ill, Upon Dawkins return he cried and pleaded from his pulpit for the well-being of his wife. He told his congregation he had promised her and the Lord that if she was permitted to live he would see she had a home for her own; that she had never had anything like other women; that she had been a wonderful mother and wife, and he pleaded with the members to contribute money to build her a home. The congregation responded in its usual generous way and approximately $12,000 was donated. Witness after witness testified they gave their money to build a home for Mrs. Dawkins.' The home is a large brick veneer ranch type house consisting of four bedrooms, two and a half baths, large kitchen, large dining room, living room with a fireplace, sun porch and a double garage, and was completed during 1953. Dawkins himself directed that a large "D" be cut into the shutters. Following its completion, the Dawkins moved into the new home, but not for long. Dawkins had located a nice duplex. The owners were in strained circumstances and Dawkins traded them a year's free rent in the new home for their equity in the duplex. Later, the Dawkins returned to the home at 903 Argentine Boulevard.

There was some evidence that a plate was on the front door of the home indicating it was a parsonage. However, the record shows that it was placed there following a split between a Reverend Jolly and Dawkins over the leadership of the Body of Christ Church. Jolly became the leader of the church and Dawkins "pulled out from the Body of Christ before they (Reverend and Mrs. Dawkins) had their trouble. They didn't have any as long as he stayed in the church, but after he pulled out, then is where they had trouble, because she wanted to do what she felt was right." Regardless of what sign or placard Dawkins later had placed on the house, if any, the evidence was overwhelming that when he asked his congregation to contribute money to build the house, *it was built for Mrs. Dawkins as her home.*

Mrs. Dawkins commenced an action for separate maintenance on October 18, 1956. During 1957 the parties effected a reconciliation. An agreement setting forth the conditions of the reconciliation provided in substance that the wife would renounce the church and its leaders to which she had been affiliated; that she work with Dawkins in his church, and that she join with her husband in executing to the trustees of Gospel Tabernacle a quitclaim deed to the home and

other properties. As a result of that agreement the deed was executed and delivered to Dawkins. Following the reconciliation and the execution of the deed, Mrs. Dawkins attempted to comply with her part of the agreement, but when she attended church Dawkins called her "a dirty spirit" and told her to get out of the church and "stay away from the people out there." It was then that Mrs. Dawkins knew the marriage could no longer continue and she filed a supplemental petition asking for an absolute divorce.

Prior to the flood in 1951 Dawkins and his mother owned a tract of land on the Kansas River near Turner, Kansas. To acquire a site to bridge the Kansas River, the State Highway Commission condemned Dawkins' property and paid him $14,000. He retained $7,000 and paid the balance to his mother. During the trial Dawkins attempted to explain where that money was spent, by, as stated by the trial court, "lying" under oath, that he had expended it in erecting a structure in the Kaw Valley near Turner. His testimony in this respect was refuted beyond question.

Prior to the 1951 flood the Dawkins resided in a large 8 or 10-room house at 1033 Scott Avenue, which they owned. Dawkins sold that property after the flood. As previously indicated, the trial court found that the "$7,000.00, plus the money from the sale of 1033 Scott Avenue, plus the contributions made in response to Reverend Dawkins' appeal for a home for his wife, more than equalled the cost of 903 Argentine Boulevard." It was further found that *"it isn't just, it isn't equitable, and it isn't proper under the evidence"* to cut "Mrs. Dawkins off without anything to show for the years she served him as his wife, and served this church as the pastor's wife." These findings of the trial court were amply supported by the evidence. Notwithstanding Dawkins placed title to the 903 Argentine Boulevard property in the name of the church trustees, a tracing of his unquestioned personal funds together with the contributions to build Mrs. Dawkins a home would prove 903 Argentine Boulevard to be his property and subject to division by the trial court in this action.

Concededly, this case presents a unique and most difficult question, but time and again this court has announced and applied the rule that where findings of fact are attacked for insufficiency of evidence or as being contrary to the evidence, its power begins and ends with the determination whether there is any substantial evidence to support them, and where findings are so supported, they

are accepted as true and will not be disturbed on appeal. (*Dryden v. Rogers,* 181 Kan. 154, 309 P. 2d 409; *Ripley v. Harper,* 181 Kan. 32, 309 P. 2d 412; *Unruh v. Kansas Turnpike Authority,* 181 Kan. 521, 313 P. 2d 286; *In re Estate of Guest,* 182 Kan. 760, 324 P. 2d 184.) These are just a few of the many cases and others may be found in 2 West's Kansas Digest, Appeal and Error, §§ 1001-1013 and 1 Hatcher's Kansas Digest (Rev. ed.), Appeal and Error, §§ 495-508.

In summary, the trial court heard evidence for eight days and saw and observed the witnesses. Dawkins' testimony proved to be untruthful, and to say the least, the trial court was justified in refusing to give it credence. Equally important is the fact that the trustees were frequently by-passed by Dawkins after their selection. They were, as a matter of fact, ignored by him except when he saw fit to use them. In my judgment he should not be permitted to hide behind a board which he selected and cominated, and which the trial court found to be "a straw board created by Reverend Dawkins to meet a legal necessity, to-wit: the requirements of the R. F. C."

I think the judgment of the trial court was correct and should have been affirmed.

JACKSON, J., concurring: The only theory upon which the legal conclusion of the trial court and of the dissenting opinion can be supported may be boldly stated as follows: Reynolds Dawkins was conducting the Gospel Tabernacle as a commercial enterprise for his own monetary advancement. True, he gave the people certain psychological and spiritual benefits in return for their church contributions, but legally, all of the alms of these people—who were often very poor people—became the personal property of Dawkins. That being true, Mrs. Dawkins, after twenty-seven years of married life, is entitled to alimony from this commercial enterprise of her husband. This theory of commercial enterprise is the theory adopted by the Dawkins daughter in the statement mentioned by the trial court in its findings and quoted in the dissenting opinion.

No church law or secular law which would uphold a minister of the gospel in so "milking" his followers, however untutored they may be, has been found. Mr. Dawkins made no such claim, and the lower court found no fraud upon his part.

The dissenting opinion quotes one sentence from the opinion of

the trial court which reads: "Justice in this case demands that plaintiff have the right to occupy this home which was built for her out of the goodness of the hearts of the members of this congregation."

Neither this nor the quotation from the memorandum of the trial court on motion for new trial would seem to be a *finding* that the "members" intended that the *title of the house should be in the parson's wife*. We do not think the learned trial judge went so far as to make such a finding. There is no dispute that much of the money used to build the house was contributed or borrowed by the members of the church.

There were a comparatively few *former* members who did testify they did have such an idea at the time they made their contributions for the building of the parsonage that it would be the wife's own house. But there were many who testified the house was built as a parsonage for the church. The trial court did not find to the contrary, but simply found "that the church and Reverend Dawkins are one and the same—that neither the church nor the Board of Trustees had an independent identity separate and apart from the minister."

The record appears to show without cavil that the parsonage property stood in the name of the church trustees at all times; that it was built with the help of a loan from defendant bank in the sum of $10,000. This mortgage was signed by the trustees of the church. The building was marked by a sign reading "Parsonage." When it was placed on the building we think is somewhat in doubt, but there is evidence which would definitely refute the statement in the dissenting opinion. The trial court made no finding on that point. On completion of the tabernacle, all of the church debt was consolidated in a mortgage by the church trustees in the sum of $45,000, which covers the church building itself and the parsonage.

Thus, in granting alimony to the wife, the trial court was compelled to say:

"Title to the real property commonly known and designated as 903 Argentine Boulevard will be ordered deeded to LaVerne Dawkins, and upon the failure of defendants to execute such a deed to the plaintiff, this decree shall stand in lieu thereof." (Italics supplied.)

It may be noted that the trial court avoided the possibility of having to hold the church trustees in contempt should they refuse to deed the church property to the divorced wife of the minister

by noting that its decree might operate *in rem* as the statute provides.

It is true the trial court was much interested in a sum of $7,000 which seemed to belong to Dawkins. The court said Dawkins lied concerning the use of this fund. The only evidence that any of this money went into the 903 Argentine property seemed to come from Dawkins himself. He testified he made a contribution to the building fund.

In the end, the trial court said:

"Now, I think Reverend Dawkins has a conscience; I am not convinced that he made away with church funds."

As I understand, this court is not holding that Mrs. Dawkins may not have alimony and child support from funds and property belonging to Dawkins. What it does say is that the rights of the members of the Gospel Tabernacle must be considered. One of those members testified in relation to the fund raising campaign to build the parsonage:

"When Reverend Dawkins returned from the camp-ground, he made the statement that he wanted to build a home, but that it would be a parsonage and whoever succeeded might be living in it. It was theirs as long as he was the pastor and she was his wife. He made this statement from the pulpit. I was there and heard it. I contributed to the parsonage, probably two or three hundred dollars. At the time I made the contribution I didn't even own the bed I slept in, so I don't believe I would have been stupid enough to give a home personally for one woman. I knew it belonged to the church. I didn't intend for my contribution in any way to enrich Reverend Dawkins and his wife personally. I wanted them to have the comforts of home, but it belonged to the church."

We do not believe that under the findings of the trial court, this property standing in the name of the church trustees should be transferred to the wife of the minister upon the theory that this church was only a commercial enterprise belonging to Mr. Dawkins. Mrs. Dawkins was a minister's wife for twenty-seven years and she is entitled to no more right to the church property than the wife of any other minister.

The dissenting opinion notes that Dawkins often took title to real estate in his own name, sold it under contract, and had no adequate bookkeeping system. Most of these transactions were made during the period of the post 1951 flood days, when the minister is conceded to have played an important part in the rehabilitation of the area around the church. Many of the people he helped were

members of his flock or became members. While there is no reason to especially defend the Reverend Mr. Dawkins in making this decision of the court, it may be noted that the dissenting opinion quotes from only one side of a disputed question of fact as to the method of issuance of insurance policies to the members of the church. The trial court made no specific finding in reference thereto. At best, it would only be evidence that the church and Dawkins were one—that the church is a commercial enterprise. If Mr. Dawkins were fraudulent—which the trial court found he was not—this court of equity should impose a trust for the benefit of the church, not destroy the trust.

I refuse to be a party to holding that any man's church—whatever may be its church government or doctrine—shall be considered by a court of law and equity to be merely a commercial enterprise for the benefit of the preacher. I also refuse to enter into the doctrinal disputes between the Reverend Messrs. Dawkins and Jolly.