## The Attorney General vs. The Merrimack Manufacturing Company.

Before 1825 a manufacturing corporation laid out a village; their agent and other persons in their employ organized as a religious society, and notified to the territorial parish their election to have their taxes appropriated to the support of the new society. The manufacturing corporation staked out a lot of land, and erected a stone church and parsonage upon it, and the church was consecrated in 1825 by the bishop of the diocese according to the rites of the Protestant Episcopal Church at the request of said agent, who was present and delivered the keys to the bishop. The agent sold the choice of seats by auction at a fixed annual rent; the seats sold to be held while the purchasers should pay such rent and remain in the employ of the corporation, and then "to be at the disposal of the church-wardens." The corporation engaged a clergyman, and agreed with him to pay his salary, and to provide him with a house, but reserved the right to substitute another form of worship, on giving him a year's notice; and also gave to the church a Sunday school library and an organ. In 1826 the corporation conveyed away all their lands; and took a reconveyance, "in consideration of one dollar and for the purpose of supporting divine worship," of this "church lot, together with the church and the parsonage or minister's house thereon standing," *habendum* "forever, so long as they shall use or permit the same to be used and appropriated to divine worship and for a residence of the minister of the gospel, and no longer; these being the whole object and intent of the parties to this conveyance;" and subject to a right of reëntry for breach of condition. In 1827 the corporation leased the church and parsonage for fifteen years, if the contract with the minister should continue so long, to the religious society, who agreed to pay the minister's salary and all expenses and taxes. At the expiration of the lease the corporation sold the church to the society, and expelled the minister from the parsonage, which up to that time he had occupied without payment or demand of rent. *Held*, that there was no dedication of the church or parsonage to the support of public worship.

A deed of a "church lot, together with the church and the parsonage or minister's house thereon standing," to a manufacturing corporation, "in consideration of one dollar and for the purpose of supporting divine worship," *habendum* "so long as they shall use or permit the same to be used and appropriated to divine worship and for a residence of the minister of the gospel, and no longer; these being the whole object and intent of the parties in this conveyance;" and reserving a right of reëntry to the grantors upon failure to comply with "the object and intentions of the parties hereto, as above expressed;" does not create a trust for the support of divine worship, or a limitation; but an estate upon condition, which is made absolute by a subsequent release from the grantors.

Information, filed at April term 1856 in Middlesex by the attorney general, at the relation of the rector, wardens and vestry of St. Anne's Church in Lowell, for the establishment and execution of a charity in a church lot in Lowell and the church and parsonage thereon standing, and to recover the price paid by the relators for the church. The Merrimack Manufacturing Company filed an answer; and the parties submitted the case

(subject to all exceptions to the competency of evidence) to the decision of the court upon the information, answer and agreed statement of facts, which, so far as is material to the points decided, exhibited the following case :

The Merrimack Manufacturing Company in 1822 and 1823, pursuant to the authority conferred on them by *Sts.* 1821, *c.* 46, and 1823, *c.* 17, purchased large tracts of land in the town of Chelmsford, and dug canals, erected factories and other buildings, and laid out the town of Lowell, which was incorporated as a separate town by *St.* 1825, *c.* 112. Prior to February 1824 there were more than one thousand persons within that territory, mostly employed by said company; there was no church or other place of worship there at that time, nor until after the incorporation of the town of Lowell; and said company owned more than three fourths of all the taxable property within those limits, and were liable to be assessed thereon for parochial purposes in the first parish of Chelmsford, whose meeting-house was four miles distant.

On the 26th of February 1824 Kirk Boott and others, officers or servants of said company, under a warrant issued at their request by a justice of the peace, assembled at the counting room of said company at Chelmsford, and organized as " The Merrimack Religious Society," and retained that name until 1831, when they took the name of " The Congregation of St. Anne's Church," and afterwards of " The Rector, Wardens and Vestry of St. Anne's Church." After this organization, divine service was performed every Sunday according to the form of worship and canons and rubrics of the Protestant Episcopal Church of the United States, for and with this society, in a school-house built by the respondents and arranged by them for this purpose, by the Rev. Theodore Edson, whose salary and all other expenses of the church were paid by the respondents; and they retained the sum of thirty seven and a half cents quarterly out of the wages of each person in their employment for the support of public worship, whether they attended said services or not.

On the 29th of April 1824 the election of several persons who

had withdrawn from the First Parish in Chelmsford, and joined this society, to have their taxes appropriated to its support, was notified to that parish by the clerk of this society, who was also a clerk of the respondents; and other persons afterwards in like manner withdrew from that and other neighboring religious societies, and joined this one.

On the 27th of December 1822 the directors of the Merrimack Manufacturing Company voted, " That P. T. Jackson and Kirk Boott be a committee with authority to build a suitable church for the use of the company at Chelmsford, and that a sum not exceeding five thousand dollars be appropriated for that purpose;" and on the 15th of April 1824, " That the agent be authorized to build a church at Chelmsford, of stone, and that a sum not exceeding nine thousand dollars be appropriated for the purpose." No other votes were ever passed by the respondents or their directors relating to the building or consecration or dedication of the church or parsonage.

In the spring of 1824 Boott staked out and set apart an acre of land as a church lot for a church and parsonage, and erected and finished a stone church thereon, which on the 16th of March 1825, at his request, was consecrated by the bishop of the diocese, according to the forms and canons of the Protestant Episcopal Church. Boott was present during the whole ceremony; and the original act of consecration (which is copied in the margin *) was delivered to the respondents, in whose possession

---

* In the name of the Father, and of the Son, and of the Holy Ghost. Amen.

Whereas the Lord has put it into the hearts of certain persons, forming the Merrimack Manufacturing Company, in their corporate capacity, and at their own proper expense, to erect a house to the honor and worship of Almighty God, in the town of Chelmsford and the State of Massachusetts, which pious work they have accomplished, and have furnished the said house, to be called St. Anne's Church, with a pulpit, reading desk and table for the Holy Communion, and other things necessary and convenient for the decent performance of all parts of divine service ; and whereas the said company, by their agent Kirk Boott, and with the consent of the wardens of the said church, have invited me whose name is under-written, being, by divine permission, **Bishop** of the Protestant Episcopal Church

it has since remained. The bishop had prepared and tendered to Boott an instrument of dedication (also copied in the margin*) which he refused to sign. The complainant and relators claim, and offer to prove, if deemed material by the court, that it is contrary to the rules and canons of the Protestant Episco-

in the Eastern Diocese, to consecrate the said house to the honor and worship of Almighty God.

I do therefore solemnly and in the name of God pronounce and declare that this house, erected as aforesaid, and called St. Anne's Church, is duly set apart and consecrated to Almighty God, and is not hereafter to be appropriated to any common or profane use; requiring that henceforth it be held as sacred to religious purposes; that it shall be entered with reverence, considering that God is in heaven and men upon earth; that in this place men shall humbly and devoutly confess their sins before God, and set forth his most worthy praise; that the sacraments and other religious rites be in this house regularly celebrated and performed, according to the institution of our Lord Jesus Christ, and the practice of his Holy Apostles; that the Holy Scriptures shall be here read for the instruction of the people, and the word of God be duly and faithfully preached according to his own appointment.

In testimony whereof I have hereunto set my hand this sixteenth day of March in the year of our Lord one thousand eight hundred and twenty five.

ALEXANDER V. GRISWOLD.

* Know all men by these presents, that the Merrimack Manufacturing Company, having been piously disposed at their own expense to erect a house for the public worship of Almighty God, and have through his blessing been enabled to perform the same, they having in the town of Chelmsford and State of Massachusetts built of stone and finished a handsome edifice, and furnished it with things convenient for the due performance of all parts of divine service; and the said company having authorized me, whose name is underwritten, as their agent, to invite the Right Reverend Alexander V. Griswold, Bishop of the Protestant Episcopal Church in the Eastern Diocese, to consecrate the said house to the worship of God, according to the rites and liturgy of the said Protestant Episcopal Church.

I do therefore in behalf of the said manufacturing company, and with the consent of the wardens of the said church, dedicate the said house, to be called St. Anne's Church, to the service and worship of Almighty God, to be ever hereafter held sacred for religious uses and divine worship, according to the liturgy aforesaid, divesting ourselves of the right to appropriate the said house to any common or profane use, and invite the said bishop of the Eastern Diocese to consecrate the said church to the worship of Almighty God.

pal Church to consecrate or in any manner dedicate any build-
ing to divine worship for a limited time, or otherwise than
forever ; and that the bishop proceeded to consecrate the church
upon Boott's representation that such a deed would, if neces-
sary, be subsequently given.   The respondents deny Boott's
authority to have either church or parsonage consecrated or
dedicated, but admit that all these acts were known to their
officers, and to many, and might have been known to all of their
stockholders, and were not objected to by any one.

On the afternoon of the same day Boott sold the choice of
pews by auction " to those in the employ or occupying the
houses of the Merrimack Manufacturing Company, subject to
the following conditions," stated in a notice previously issued,
and signed by him as agent: " As it is not intended to levy any
tax for the support of public worship, other than what accrues
from the income of the pews, they will be put at an annual rent
of $1.50 per seat.   The sale will be continued while any person
in the employ of the company is willing to pay for a choice a
sum not less than $5.00.   This will entitle them to the pew
they may select so long as they pay the annual rent and remain
in the employ of the company.   But when they quit said em-
ploy, or neglect to pay the annual rent, their pew or seats are to
be at the disposal of the church wardens   The remaining seats
will be let at $1.50 per annum."

The church and parsonage were entered in the books of the
respondents under the head of " real estate, church and parson-
age, $15,018.25."

On the 9th of April 1825 Boott, in behalf of the respondents,
wrote to Mr. Edson a letter, proposing to give him an annual
salary of $800 and " a house rent free," and adding : " In case
the form of worship we have adopted should, contrary to my
belief and expectation, be found so unpalatable to the majority
of our people that the church is neglected, and the company in
consequence should deem it prudent to substitute some other, I
agree that you shall receive a year's notice of their intention, or
your salary for the same period, as shall be thought most ad-
visable.   I have only to stipulate on your part that if, from any

cause, you desire to be dismissed, you will give us the like no-
tice." Mr. Edson, in answer to this, agreed "to become your
minister on the terms therein stated." And this agreement was
confirmed, and ordered to be recorded, by the directors.

Mr. Edson has ever since continued to perform divine service
there, to preach to the whole population of Lowell, of all de-
nominations of Christians, who chose to attend public worship,
and could lease pews in this church, to join persons in marriage,
and do all other things which an ordained minister is authorized
to do, and to be recognized as the rector of St. Anne's Church :
and the society worshipping there continued to be one and the
same to the time of filing this information, and have constantly
chosen churchwardens and other church officers.

In the summer of 1825 the respondents erected on their
church lot a parsonage, into which Mr. Edson moved with his
family on the 21st of March 1826, and which he continued to
occupy, without payment or demand of rent, until the 27th of
February 1843.

In May 1825 the Merrimack Manufacturing Company gave
$500 to found a Sabbath school library in said society, and in
March 1828, $1000 to buy an organ for the church.

On the 3d of May 1826 the Merrimack Manufacturing Com-
pany sold and conveyed to the Proprietors of the Locks and
Canals on Merrimack River (who had been incorporated by
*St.* 1792, *c.* 13, and authorized by *St.* 1824, *c.* 47, to make this
purchase,) all their lands, including within the boundaries, but
not by specific description, this church lot. On the same day
the Proprietors of the Locks and Canals reconveyed to the Mer-
rimack Manufacturing Company the land on which their factory
and other buildings stood, which is separated by a canal and a
strip of land from the church lot; and also, by a separate deed
"in consideration of one dollar" "and for the purpose of sup-
porting divine worship," conveyed to them this land, describing
it by metes and bounds, and as "known as the church lot,
together with the church and the parsonage or minister's house
thereon standing," "To have and to hold the above described
premises, to them the said Merrimack Manufacturing Company,

their successors and assigns forever, so long as they shall use or permit the same to be used and appropriated to divine worship and for a residence of the minister of the gospel, and no longer; these being the whole object and intention of the parties in this conveyance; and neither the said proprietors, nor their successors, nor any other person or persons claiming by, from or under them, or in the name, right or stead of them, shall or will, by any way or means, have, claim or demand any right or title to the above released premises, or to any part or parcel thereof, forever, so long as the object and intentions of the parties hereto, as above expressed, shall be complied with; but upon failure thereof the said proprietors, and their successors and assigns, may reënter upon the premises, remove and expel the tenants and occupiers thereof, take and keep seisin and possession thereof, to their own use and benefit in fee simple, and be and become seised and possessed thereof, as of their former estate."

These three deeds were duly recorded. At the time of their execution all the officers and a majority of the stockholders in the two corporations were the same.

On the 29th of August 1827, at a meeting of the Merrimack Religious Society duly called for that purpose, it was voted " To accept the proposal of Kirk Boott, as agent of the Merrimack Manufacturing Company, respecting the use of the church and parsonage, which was as follows: That the company will lease the church and parsonage house, not exceeding fifteen years, to the Episcopal Society and minister now occupying and worshipping therein, upon condition that, during the term of the lease, the society shall pay the salary of the minister and all other expenses and taxes, and deliver the same, at the expiration of the lease, in as good order as they found them; and also upon condition that during the time public divine worship shall be supported there conformably to the discipline, order and doctrines of the constitution of the Episcopal Church in the United States; and also upon condition that the Merrimack Manufacturing Company be formally discharged from any obligation of theirs to contribute any sum for the support of the minister, or other parochial obligations."

Pursuant to this vote, on the 23d of November 1827, an indenture of lease was executed (under which the religious society afterwards occupied the church) which " witnesseth that the Merrimack Manufacturing Company, in consideration of one dollar to them paid, and of the contract made by the Merrimack Religious Society with the Rev. T. Edson, and for other good causes hereinafter named, do hereby lease, demise and let unto the Merrimack Religious Society the stone church in Lowell called St. Anne's, and the parsonage attached to the same, for the term of fifteen years, provided the contract alluded to with Mr. Edson should continue so long. And the lessees do promise that the said parsonage shall never be occupied or used, except as the residence of the minister ; and that no alterations or additions shall be made thereto, or to the church, without the written consent of the lessors; and further that they will deliver up the premises to the lessors, or their agents or attorney, peaceably and quietly, at the end of the term, or at the expiration of their contract with Mr. Edson, in as good order and condition, reasonable use and wearing thereof, and fire and other like casualties excepted, as the same now are ; and to pay all taxes or duties levied or to be levied thereon during the term the lessees may hold the same, and not to suffer or make any waste thereof; and that the lessors may enter to view and make improvements, and to expel the lessees, if they shall fail to fulfil the conditions of their lease. And whereas the said Merrimack Manufacturing Company do make their election to pay their minister's tax to this society, it is hereby expressly covenanted that the rent of the church and parsonage shall be a full consideration for all such taxes during the continuance of this lease."

On the 22d of May 1830 the Proprietors of Locks and Canals made a deed of release to the Merrimack Manufacturing Company, reciting the last named deed of May 3d 1826, and proceeding as follows : " Now know all men by these presents, that the said Proprietors of the Locks and Canals on Merrimack River, in consideration of ten dollars to them paid by the said Merrimack Manufacturing Company, the receipt whereof is hereby acknowledged, do hereby forever release to the said

50 *

Merrimack Manufacturing Company, their successors and assigns, the provisions and conditions expressed and contained in the deed aforesaid, so that the said Merrimack Manufacturing Company, their successors and assigns, shall hereafter hold, have, possess and enjoy all and singular the aforesaid premises, with all their privileges and appurtenances, free of all conditions, to their own use and behoof forever."

The execution of all the above instruments in behalf of the respondents was by the hand of Boott.

About 1835 a negotiation began between the religious society and the respondents, upon the subject of purchasing the church and parsonage, which continued until 1843. In 1842 Mr. Edson was notified to quit the parsonage, and did so on the 27th of February 1843, and it was subsequently occupied by the respondents; and on the 28th of February 1843 the church lot was sold and conveyed by the respondents to the religious society for the price of $12,000, " subject however to the condition that no building hereafter to be erected or now standing on said lot of land is to be used for any purpose other than as a church, vestry, or house of public worship, except that so much of said lot as lies northerly of said church may be used as the site or part of the site of a parsonage for the occupation of the pastor for the time being of said church."

On the 15th of February 1856, a committee, professing to represent the religious society, made a demand in writing on the respondents for the parsonage, with which they refused to comply. On the 28th of said February Mr. Edson entered on the parsonage, claiming the right of possession thereof as minister of St. Anne's Church.

This case was argued in February 1858, before *Dewey, Metcalf, Bigelow* and *Merrick,* JJ., and again in June 1859, before *Shaw,* C. J., *Dewey, Metcalf, Bigelow* and *Hoar,* JJ.

*J. P. Robinson & B. F. Butler,* for the relators. The lot of land described in the information was appropriated, devoted and dedicated by the owners to a public, charitable and pious use. This is shown by staking it out for a " church lot," by building a permanent stone church and parsonage upon it, and by the

public consecration of the church; by the respondents' contracting with and paying a minister, and taxing their operatives for his support; by the organization of the Merrimack Religious Society; and by the terms of the deed of this lot in May 1826 from the Proprietors of Locks and Canals to the respondents.

These acts constitute an appropriation and dedication to a pious and charitable use, which cannot be revoked; but is fastened upon the land; and being wholly donative in its character, and indefinite as to its beneficiaries, any intrusion upon it or perversion of its funds is to be redressed by the attorney general. *Beatty* v. *Kurtz,* 2 Pet. 566. *Pawlet* v. *Clark,* 9 Cranch, 292. *Vidal* v. *Girard,* 2 How. 155, 161, & note. *Bartlett* v. *Nye,* 4 Met. 378. *Magill* v. *Brown,* Brightly, 386, 406 & cases cited. *Attorney General* v. *Wallace,* 7 B. Mon. 611. *Attorney General* v. *Shore,* 11 Sim. 592, 7 Sim. 290, and 9 Cl. & Fin. 355. *Drummond* v. *Attorney General,* 2 H. L. Cas. 837. *Attorney General* v. *Caius College,* 2 Keen, 150. *Perne* v. *Oldfield,* 2 Ch. Cas. 31. Vin. Ab. Charitable Uses, B. pl. 19; C. pl. 10, 11. Adams on Eq. 59, 68. Colony Ord. 1641, Anc. Chart. 52. Prov. St. 28 G. 2. Anc. Chart. 605. *St.* 1785, *c.* 51. Rev. Sts. *c.* 20, §§ 39–43. Commissioners' report on the Rev. Sts. *c.* 20, § 43.

No person could have any property in the house or buy any pew, nor be in any way liable to taxation therefor. By the conditions of sale, the pews not chosen were " to be at the disposal of the church-wardens."

This is a public use. Grants and appropriations for the support of divine worship and the propagation of the gospel, and ministers' houses, have always been held to be public in their nature, and within the *St.* of 43 Eliz. and our provincial statutes before cited. Authorities above cited. *Going* v. *Emery,* 16 Pick. 107. *Attorney General* v. *Federal Street Meeting-house,* 3 Gray, 1. *Austin* v. *Thomas,* 14 Mass. 333. *Brown* v. *Porter,* 10 Mass. 93. *Bailey* v. *Kilburn,* 10 Met. 176. *Burbank* v. *Whitney,* 24 Pick. 146. *Bartlet* v. *King,* 12 Mass. 543. *Chapin* v. *School District in Winchester,* 35 N. H. 445. " Usage, especially in ancient transactions, is a good contemporaneous construction of a doubtful grant." *Hadley* v. *Hopkins Academy,* 14 Pick. 267. *Crafts* v. *Hibbard,* 4 Met. 438.

By the delivery of the keys to the bishop and the act of consecration it " is henceforth to be held sacred to religious purposes." Form of Consecration of a Church or Chapel, in Book of Common Prayer. Selden's Table Talk, 6 Selden's Works, 2023. Spelman *de non Temerandis Ecclesiis,* Spelman's Works, (2d ed.) 1, 6, 7.

The respondents were a perpetual corporation, constructing the most permanent works, such as building houses, laying out streets and digging canals, and in fact founding a community. To test it: suppose the church had been used, as it might have been under our ritual, for a place of sepulture, would it be pretended that the dead were not permanently there?

By building this church the respondents escaped parochial taxation, which they could not do by founding a private chapel. *Amesbury Nail Factory* v. *Weed,* 17 Mass. 53. Prov. St. 15 G. 2, Anc. Chart. 537. Members of other religious societies withdrew from their former parishes, and joined this congregation. Mr. Edson joined in marriage and did other acts of a public ordained clergyman, preaching to the whole population of Lowell. If this was not a house of public worship, the town which the respondents founded would have been liable to indictment in six months after its incorporation. *St.* 1799, *c.* 87, § 2.

By the deed of May 3d 1826, conveying to the respondents " the fee of a church and parsonage," and accepted by them, the use of the house at once vested in the minister, by the words of the description of his office, and the words " as now improved and used." *Brown* v. *Porter,* 10 Mass. 93.

The respondents, in their vote of November 1827 for a lease, expressly stipulate that " public divine worship " should be supported therein, and that they shall be released thereby from all " parochial " or public " obligations." Why elect to pay minister's tax on their own private chapel? They also endowed it with a Sunday school library and an organ.

In the deed of 1843 to the relators, for full consideration, the respondents inserted a condition that no building upon this land should be used for any other purpose than as a church, vestry, or house of public worship, or a parsonage.

A corporation, when it is for its interest, may convey by dedication, as well as by any other method of conveyance. Com. Dig. Bargain & Sale, B. 3. *Phillips Academy* v. *King*, 12 Mass. 546, 558. *Hobbs* v. *Lowell*, 19 Pick. 405, 409. *Proprietors of Locks & Canals* v. *Lowell*, 7 Gray, 223. *Canal Bridge* v *Methodist Religious Society*, 13 Met. 335. *Hadley* v. *Hopkins Academy*, 14 Pick. 240.

By their deed of May 3d 1826, the Proprietors of Locks and Canals conveyed a qualified or base fee to the respondents, so long as they shall carry out a common intention by applying it to a particular use. 1 Cruise Dig. tit. 2, *c.* 1, §§ 5, 6. Shep. Touch. 509. This, by the authorities above cited, was a pious and charitable use, as appears by the consideration — one dollar' and the support of divine worship; by the description — "known as the church lot, together with the church and parsonage or minister's house thereon standing;" by the possession — "as they are now occupied and improved;" by the habendum —" forever, so long as they shall use or permit the same to be used and appropriated to divine worship and a residence of the minister of the gospel, and no longer;" by the further clause — "these being the whole object and intent of the parties to this conveyance;" by the covenants and stipulations to protect the use; and by the clause of reëntry.

The creation of a trust does not depend upon the use of that word, " but rather upon the object, purpose and construction of the whole instrument." *Earle* v. *Wood*, 8 Cush. 443. *Burgess* v. *Wheate*, 1 Eden, 195. Com. Dig. (5th ed.) Appendix to " Chancery," 991.

The relators do not desire to take any profit or use of the estate to themselves, but only to be the almoners of the bounty of the grantors for the benefit of the whole community, who are the beneficiaries of this charity; and this information therefore is the appropriate remedy. Adams on Eq. 73, 74. *Attorney General* v. *Federal Street Meeting-house*, 3 Gray, 1. *Anon.* 3 Atk. 277. *Attorney General* v. *Heelis*, 2 Sim. & Stu. 76. *Attorney General* v. *Haberdashers' Co.* 1 Myl. & K. 420.

If this is a trust for a charitable purpose, no indefiniteness of description of the objects, or want of capacity in the trustee to take, will be permitted by a court of equity to work a failure of the trust. *Washburn* v. *Sewall*, 4 Met. 63, and 9 Met. 280. *Brown* v. *Kelsey*, 2 Cush. 243. *Winslow* v. *Cummings*, 3 Cush. 358. *Mills* v. *Farmer*, 1 Meriv. 55. *Moggridge* v. *Thackwell*, 7 Ves. 36.

By the deeds of May 3d 1826, the fee of the church lot became vested in the respondents, and the usufruct thereof in the worshipping congregation and their minister, with a mere possibility of reverter to the grantors if the use should cease and the limitation take effect. The words used are express words of limitation — "so long as," "*quamdiu*," "*dummodo*" — and cannot be held to create a condition, especially in a conveyance in fee. Shep. Touch. 121, 124, 125, 151, 158, 249, 252. 2 Cruise Dig. (Greenl. ed.) tit. 13, *c.* 2, § 29, note. 4 Cruise Dig. tit. 32, *c.* 24, §§ 3–8. *Page* v. *Hayward*, 2 Salk. 570. *Brattle Square Church* v. *Grant*, 3 Gray, 150.

The deed of May 1830 therefore conveyed no new estate to the respondents; but merely estopped the grantors to claim any estate in the event of the limitation taking effect, and so made the charity perpetual; and, taking away the visitorial power of the grantors, left the respondents at once trustees and visitors, for whose abuse of the trust an information lies. *Ex parte Kirkby Ravensworth Hospital*, 15 Ves. 314. *Ex parte Wrangham*, 2 Ves. Jr. 609. *Attorney General* v. *Black*, 11 Ves. 191.

If in May 1830 the respondents held this estate in trust for pious and charitable uses, then any conveyance or assurance to the trustees enures to the benefit of the *cestuis que trust*. *Attorney General* v. *Dudley*, Coop. 146. Adams on Eq. 59, 60, & cases cited.

Even if the relators have mistaken their title, yet if the whole case discloses a title for them and their successors, the proceedings may be amended, and that title established. *Attorney General* v. *Federal Street Meeting-house*, 3 Gray, 52. *Attorney General* v. *Brereton*, 2 Ves. Sen. 425. *Attorney General* v. *Middleton*, 2 Ves. Sen. 328.

*J. G. Abbott & C. F. Blake,* for the respondents.   This infor-
mation cannot be sustained to enforce a trust, even a trust in
favor of a charity, unless it is a public charity.   The trust set
up is not a public charity, but a charity in favor of the relators.
A public charity can only be created by voluntary gift, for some
general charitable purpose.   If the beneficiaries are specifically
pointed out by the donor, it is not a public charity.   *Attorney
General* v. *Federal Street Meeting-house,* 3 Gray, 1.   *Attorney
General* v. *Cock,* 2 Ves. Sen. 273.   *Attorney General* v. *Buck-
nall,* 2 Atk. 328.   *Attorney General* v. *Heelis,* 2 Sim. & Stu.
76.   *Attorney General* v. *Haberdashers' Co.* 1 Myl. & K. 420.
*Ommanney* v. *Butcher,* Turn. & Russ. 271.

But here is no trust.   The land is admitted to have been the
absolute property of the respondents, and it is not contended
that they have made any conveyance to a charitable use, but
only that by their acts they have dedicated it to such use.   A
dedication, though it may be for a limited purpose, must be for
the whole public, and not to a portion of the public.   *Poole* v.
*Huskinson,* 11 M. & W. 830.   *Barraclough* v. *Johnson,* 8 Ad. &
El. 99.   *Commonwealth* v. *Philadelphia,* 16 Penn. State R. 79.
*Commonwealth* v. *Low,* 3 Pick. 413.

In this case, the relators claim the whole beneficial interest
in the property and the exclusive care and custody of it.

There are no acts from which a dedication can be inferred.
The facts, that the respondents hired the clergyman, and reserved
the right to change the form of worship; leased the pews to
such persons only as they desired; their agent's refusal to sign
a deed of dedication; the subsequent conveyance to the Pro-
prietors of Locks and Canals, and reconveyance from them;
the lease for years to the relators for a valuable consideration;
the entry of the estate in the books of the respondents as part
of their assets; the sale of the church and taking possession
oi the parsonage; conclusively disprove any intention of the
respondents to dedicate, or any understanding of the relators
that there had been a dedication, for more than twenty five
years after it is now alleged to have been made.

The consecration by the bishop was a mere religious cere-

.mony, to enable the respondents to use the church according to the forms of the Episcopal service, and was evidently so intended by all parties.

A dedication can only be created by a voluntary donation by the owner, and acceptance by the public. Without the *animus dedicandi*, there can be no dedication. *The King* v. *St. Benedict*, 4 B. & Ald. 447. *Poole* v. *Huskinson*, 11 M. & W. 830. *Barraclough* v. *Johnson*, 8 Ad. & El. 99. *Rex* v. *Hudson*, 2 Stra. 909. *Wood* v. *Veal*, 5 B. & Ald. 454. *Roberts* v. *Karr*, 1 Campb. 262, note. *Green* v. *Chelsea*, 24 Pick. 80. *Bachelder* v. *Wakefield*, 8 Cush. 245. *Bowers* v. *Suffolk Manuf. Co.* 4 Cush. 339. *Dwinnell* v. *Barnard*, 28 Maine, 564. *Gowen* v. *Philadelphia Exchange Co.* 5 W. & S. 141. *Heaston* v. *Commissioners of Randolph*, 2 Ind. 420. *Cammeyer* v. *United German Lutheran Churches*, 2 Sandf. Ch. 236. *Ward* v. *Davis*, 3 Sandf. 502. *Pitcher* v. *New York & Erie Railroad*, 5 Sandf. 587. *Badeau* v. *Mead*, 14 Barb. 328. *Pownal* v. *Myers*, 16 Verm. 408.

There is nothing in the nature of the use for a church and parsonage, which prevents an appropriation by the owners to other and secular uses. *First Parish in Medford* v. *Medford*, 21 Pick. 199. *Emerson* v. *Wiley*, 10 Pick. 317. *Bachelder* v. *Wakefield*, 8 Cush. 245.

In May 1826 the Proprietors of Locks and Canals, holding the fee of the land, could convey it as they pleased, and with such limitations or conditions as they thought proper ; and the relators, not parties or privies to their deed, cannot set up any rights under it. The relators were then an organized religious society, to whom the conveyance might have been made, if such had been the intention.

The deed contains no words which can be construed to create a trust, while it does not use apt words to convey a conditional estate, especially by providing for a reëntry. Doct. & Stud. dial. 2, *c.* 34. 1 Rol. Ab. 407, 408. Co. Lit. 203, 204 *b*, 329, 330, 331. *Duke of Norfolk's case*, Dy. 138 *b*. Shep. Touch. 122, 125. Com. Dig. Condition, A. 2. Bac. Ab. Condition, H. Vin. Ab. Conditions, C. 4 Cruise Dig. tit. 32, *c.* 25, §§ 1-3. 4 Kent Com. (6th ed.) 126, 128. 11 Amer. Jurist, 42, 50, 51

*Fifty Associates* v. *Howland*, 11 Met. 99. *Hayden* v. *Stoughton*, 5 Pick. 528. *Austin* v. *Cambridgeport Parish*, 21 Pick. 215. *Clapp* v. *Stoughton*, 10 Pick. 463. The grantors therefore had a right of reëntry for breach of condition, which they might and did release to the grantees.

Suppose there had been no release, and the condition had been broken, could the attorney general at the relation of St. Anne's Church have obtained a decree for the appropriation of the fund against the claim of the Proprietors of Locks and Canals to enforce the forfeiture?

Hoar, J. This is an information filed by the attorney general, at the relation of the rector, wardens and vestry of St. Anne's Church in Lowell, to enforce the performance of a trust by the respondents, under and by virtue of which it is contended that a lot of land, with a stone church and parsonage thereupon, ought rightfully to be held and appropriated by the respondents for the purposes of a public charity.

Two principal questions are raised upon the pleadings and agreed statement of facts, which, with others of less and incidental importance, have been twice argued before us, and have been discussed by counsel with a learning and ability proportionate to the magnitude and interest of the cause.

The first of these questions is, whether a dedication of the lot of land, upon which St. Anne's Church in Lowell was erected, to a pious and charitable use, was ever made by the respondents, so that the land was irrevocably appropriated to such use, and was no longer under their control nor subject to their disposal? If such a dedication has been made, and has been so far completed that the holder of the legal estate became a mere trustee for the purposes of the charity, it would follow that no subsequent conveyance to any grantee having notice of the trust would be effectual to change the use, and such grantee would take the estate subject to the trust; and therefore if the relators have established the fact of such a dedication, the use is fastened upon the land; as it would hardly be contended that any subsequent conveyance was made without full and ample notice of all the circumstances affecting the title.

It is perhaps not easy, in a case like the present, to state with precision what is meant by a dedication to a pious and charitable use. It seems to be understood by the relators that if the respondents, being the owners of a piece of land, formed the purpose and intention that it should be thenceforward appropriated for a church, and a residence for a clergyman who should officiate in the church, and indicated such intention by acts which were equivalent to a deliberate declaration of such a purpose, although no conveyance of the land or any estate or interest therein was made, it might still be sufficient to create the charitable use. This statement is qualified by the admission that the church must be devoted to the public worship of God, as distinguished from a private chapel, or place of private worship. But the question remains, what, in such a connection, is meant by the public worship of God? And it may be that some confusion of ideas arises from the ambiguity of this form of expression.

Public worship may mean the worship of God conducted and observed under public authority; or it may mean worship in an open or public place, without privacy or concealment; or it may mean the performance of religious exercises under a provision for an equal right in the whole public to participate in its benefits; or it may be used in contradistinction to worship in the family, or the closet. In this country, what is called public worship is commonly conducted by voluntary societies, constituted according to their own notions of ecclesiastical authority and ritual propriety, opening their places of worship, and admitting to their religious services such persons, and upon such terms, and subject to such regulations, as they may choose to designate and establish. A church absolutely belonging to the public, and in which all persons without restriction have equal rights, such as the public enjoy in highways or public landings, is certainly a very rare institution, if such a thing can be found. Religious societies of various denominations, incorporated by special acts of the legislature, or under general laws, or, as is often the case, consisting merely of a company of persons associated together without any corporate capacity, and holding

their property through the intervention of trustees, erect build-
ings as places of worship, consecrate them with religious cere-
monies, and make provision in them for the due observance of
sacraments and ordinances.   In some instances the property in
the church is not in the same body of proprietors as that which
provides for and controls the religious exercises which are per-
formed in it.   Rights of pews and sittings are often created and
conveyed, by which the power of the proprietors to dispose of
the church may be to some extent qualified and limited.   Con-
tracts may be made with particular societies, producing a like
limitation.   But in the absence of any contract or gift, (and a
gift is strictly a contract,) by which the legal or equitable estate
of the owner of the fee of the land is itself diminished, it has
certainly never been held in this commonwealth, and we do not
know that it was ever suggested, that the power of disposing of
the property, or of changing the use to which it should be ap-
plied, did not remain as absolute and unquestioned as in the
case of any other real property.   We know no rule of law
which would prevent the sale of any church by its owner, and
the use of the proceeds for any purpose to which that owner
might lawfully appropriate money, merely because it is a church,
if the title is subject to no trust, and is unincumbered.   When
the towns of Massachusetts were both parochial and municipal
corporations, it was an ordinary practice to change the appropri-
ation of land from a parochial to a municipal use, or the con-
trary; and the fact that the use to which it was first appropriated
was a pious and charitable use, or was for the support of public
worship, was never held to affect the legality of the change.   In
the case of *Pawlet* v. *Clark*, 9 Cranch, 292, the supreme court
of the United States decided that the reservation of land as the
glebe for the Church of England, in the grant from the crown
in the charter of the town of Pawlet, was itself to be construed
as a grant; that no Episcopal church, as a part of the national
religious establishment, having been founded in Pawlet before
the revolution, the title to the land vested in the town, as being
charged by law with the support of public worship; and that it
was lawful for the town, with the assent of the legislature, to

change the use, and apply the land to the support of schools. We suppose that churches of all denominations have been, certainly they may have been, sold by their owners, notwithstanding their consecration or dedication to religious uses. The consecration is, and is to be regarded as, a religious ceremony, and not as an act qualifying the estate in the land.

But on the other hand, donations, grants and devises have been sustained and executed by courts of equity as appropriations to pious and charitable uses, where the element of public right or interest could hardly be found; such as for a church, or the support of a pastor or teacher, of a particular and perhaps a very small denomination; or for the benefit of a particular district or territory; or of persons connected with a designated institution; or of a particular employment, age, sex, color, descent or nation. It would seem, indeed, that there must be some strictly public object of bounty, or such indefiniteness in the designation of those who are beneficially interested, that no persons competent to sue can claim a direct interest in themselves, to authorize a proceeding by information in the name of the attorney general to enforce the due administration of the charity. But the dedication or appropriation to pious and charitable uses may be complete, so that the use will be established and the trust enforced by a court of equity, where the object is not a distinctively public one. And we are of the opinion, that whatever else may be essential to constitute a dedication of land to pious uses, the mere appropriation of it by its owner to the uses of a church, or of public worship, in the sense in which that phrase is usually understood, is not sufficient; that there must be a donation by the owner; some unequivocal act uniting with the intent to divest himself to some extent of the ownership or power of control over his property, and vest an independent and irrevocable interest therein in some other person or body. *Attorney General* v. *Lord Foley,* 1 Dick. 363.

In most of the numerous cases which have been cited in the argument, there has been no question in regard to this intent; and the act by which the owner created the trust or the use has been explicit and direct; usually, indeed, a devise or a grant.

In some of them the appropriation was made by the vote of a town, or of proprietors, whose title could be conveyed by vote.

The only exception is the case of *Beatty* v. *Kurtz*, 2 Pet. 566. In that case there had never been any devise or grant, by which the legal estate in the land had been divested from the original owner. But he had laid out a town, according to a plan on which one lot was marked "for the Lutheran church." This plan was afterwards, by a statute, required to be recorded, and copies thereof made evidence in the courts of law and equity. An unincorporated society of the German Lutherans had taken possession of the lot, erected a house of worship thereon, enclosed it, and used a part of it as a burial ground; and had continued in the undisturbed and unquestioned possession of it for more than fifty years. No taxes had been assessed upon it during all this period, and it had been treated by the public authorities as church property. The owner died, having recognized the right of the Lutheran Society to the end of his life; and after his death his administrator sold all his other lots, but made no claim to this. His son and heir, who was a defendant in the suit, had, for sixteen years after his father's death, not only omitted to take any possession of the land, or assert any claim to it, but had repeatedly admitted in express terms the right of the Lutheran Society. In short, the facts in the case were abundant to prove a legal title, by adverse occupation, if the possession had been in any person or corporation competent to hold the land. Under these circumstances the court held, that there was proof of a dedication of the lot to a charitable use, which a court of equity would execute in favor of a religious society, who for want of an act of incorporation were incapable of taking the legal title. But the decision rests upon the conclusion that the intention of the original owner, not merely to have a church upon the land, but a church belonging to and controlled by other persons than himself, and acts of donation done in pursuance of such intention, were proved beyond all controversy.

We must then carefully examine the situation, objects, relations and conduct of the respondents in the case before us, to

51 *

see whether sufficient evidence is furnished of such a dedication of their land as the relators allege.

The Merrimack Manufacturing Company were incorporated in the year 1822, for the purpose of making and printing cotton goods in the town of Chelmsford. *St.* 1821, *c.* 46. They purchased a large tract of land, and proceeded to dig canals, build factories, lay out streets, and do all that was necessary to establish a manufacturing village. Under the Constitution and law of the Commonwealth as they then existed, all persons and corporations in the several towns were required to contribute to the support of public worship; and the Merrimack Company were liable to be assessed for this purpose in the first parish in Chelmsford, whose meeting-house was four miles distant from the territory belonging to the company. A large population was soon gathered upon this territory, almost the whole of whom were in the employment and under the direction of the company. There was therefore a direct interest of the company, that some provision should be made for public worship and religious instruction in their own neighborhood; of which they might have the benefit, through its influence upon the morals, good order and intelligence of the people whom their enterprise had assembled.

In order to secure the advantages of public worship, a meeting-house, or suitable place for the accommodation of the worshipping congregation, must be provided. The Merrimack Manufacturing Company were the chief owners of property, and were liable in some form to sustain the chief burden of the necessary expense of erecting such a building. In order to gain the object of appropriating the taxes upon their property, and upon the polls and estates of the persons in their employment, in a manner profitable and convenient to the taxpayers, it was requisite that a new parish or religious society should be established. And provision was made for accomplishing both these results.

On the 27th of December 1822, the directors of the Merrimack Manufacturing Company voted, " That P. T. Jackson and Kirk Boott be a committee with authority to build a suitable

church for the use of the company at Chelmsford, and that a sum not exceeding five thousand dollars be appropriated for that purpose;" and on the 15th of April 1824, "that the agent be authorized to build a church at Chelmsford, and that a sum not exceeding nine thousand dollars be appropriated for that purpose." These were the only votes ever passed by the company or its directors, in relation to the church, until the sale to the Proprietors of the Locks and Canals in 1826. It is clear upon the evidence, however, that the acts of Mr. Boott, the agent, in the erection of the church and parsonage, and in staking out the land upon which they were erected, and his other acts of a public nature in providing for the support of public worship, were done with the full knowledge and tacit approbation of the company. The first of these votes expressly provides that the church shall be built "for the use of the company;" and the second contains no intimation of any purpose to devote it to any other use.

The Merrimack Religious Society was organized on the 26th day of February 1824; and consisted wholly of persons connected with, or in the employment of the company; and its first meetings were held in a building which had been built and used by the company as a school house. On the 29th of April 1824 the election of the Merrimack Company, and of the persons who had joined the new society, to have their taxes appropriated to its support, was duly made known to the first parish in Chelmsford; and they became thereby exempted by law from contributing to parochial charges and expenses in that parish. The new religious society made no contract with a minister, and no provision for his support; but all the arrangements for religious instruction seem to have been made by the company. In the spring of the same year, the lot of land for the church and parsonage was staked out, and the company proceeded to erect a stone church and parsonage upon it. When the church was completed, it was consecrated with the usual rites of the Episcopal church; and this was done in a public and solemn manner, and undoubtedly with the full knowledge and approval of the company. The keys of the church were delivered to the

bishop as a part of the ceremony of consecration. The agent of the company then proceeded to let the pews to persons in the employment of the company, or occupying their houses, at an annual rent of $1.50 a seat; the choice of pews being offered at auction; and all seats which were not thus disposed of, were offered singly at the fixed price. The advertisement of the agent stated that persons securing the choice of pews at the auction would thereby be entitled to the pew they might select so long as they should pay the annual rent and remain in the employment of the company; but that when they should quit said employ, or neglect to pay the annual rent, their pew or seats should be at the disposal of the church wardens. We do not understand, however, that this disposal of the church wardens was authorized for any other purposes than those of the company, or was to continue except at the pleasure of the company. The company made the contract with the Rev. Mr. Edson, and paid his salary, and the other expenses of the church, and reserved from the wages of each person in their employment the sum of $1.50 a year, for the purposes of public worship, whether they attended at this church or not.

We can see in all these facts and circumstances no intention to dedicate the church and parsonage to any other use than that of the respondents, no purpose to create any interest or estate in them in any other body or person, independent, to any extent, of their own control and absolute power of disposal; but the contrary.

The purpose to have a church, that is, a building appropriated to public worship and religious instruction, established in their neighborhood, forever, or for an indefinite future, is apparent. But it is equally apparent that they intended it in the first place for their own use, and to be in their own charge, and under their own control; and there is nothing to show that they intended to divest themselves of the power of alienation, at any future time, when it should seem expedient, to any other persons or organization, who, in the future growth of the community which they were founding, might be competent and willing to take it, upon any consideration agreed upon. The building

was a permanent one, adapted for use, and having its principal value to be used, as a church; but this is true of every church built of similar materials. When a large sum of money is expended in erecting a building of a durable character, of little value except for a single purpose, the inference is strong that it is intended permanently to be devoted to that purpose. A structure is to be, permanently, a church; but the question recurs, whose church? And the answer commonly must be the church of its owners; to be used by them as long as their occasions require, and then to be sold to the best advantage, which would of course substantially confine the range of purchasers to those who would intend to occupy it for a like purpose. This church of St. Anne was designed for a church, and still is, and probably will continue to be a church, though it has been leased and sold, and may be leased or sold hereafter. Its consecration by a religious ceremony, to sacred uses, forever, proves no more than the design of the edifice, in relation to any change of title. What is called the deed of consecration seems to be merely the bishop's certificate of the due performance of the religious rites according to the forms of his sect. A deed of donation was indeed prepared by the bishop, but not executed by any one; and although it is claimed by the relators that the agent of the company promised that it should be executed afterward, if necessary, no authority is shown from the company to him which would authorize him to make such a promise, or render it binding upon them. It is besides to be observed, that this form of a deed, thus prepared, contains a statement that the church is " to be ever hereafter held sacred for religious uses and divine worship, according to the liturgy of the Protestant Episcopal Church; " while the letter to Mr. Edson, entered upon the records of the company as a statement of the contract made with him by their agent, expressly states that the company may wish to substitute some other form of worship, and provides for that contingency.

It may be noticed in this connection, that the correspondence between Mr. Edson and Mr. Boott, just referred to, is with Mr. Boott as the agent of the company. He agrees, as the agent of

the company, to pay the salary, and furnish the house to the minister; the contract is the contract of the company; and Mr. Edson, addressing him in reply as the agent of the company, agrees "to become your minister," that is, the minister of the company, upon the terms proposed. The Merrimack Manufacturing Company then not only owned the land and church, but hired and paid the minister, and regulated the disposition and occupancy of the pews and seats. There was an organized society, competent to take and hold any estate or interest of which the company might choose to divest itself; and if it was the purpose of the company to alienate any of their property for religious uses, there is no apparent reason why that purpose should not have been executed. Especially if they intended to dedicate their property to the use of these relators, the simple and ordinary forms of a conveyance would have accomplished the object.

But the company were themselves a permanent body, able to execute their charitable purposes from time to time, as prudence or generosity might dictate, and with such modifications as circumstances might require, without parting with the dominion over their property. We think they did not by any act relinquish this dominion, and that there was no dedication of their land to pious or charitable uses before the conveyance to the Proprietors of the Locks and Canals by the deed of May 3d 1826.

The matter of the parsonage stands on still stronger ground than that of the church, as the respondents had agreed by their contract with the minister to furnish him a house; and there were no separate acts or votes respecting it which would make the case of the relators in any respect better.

It would be an interesting question to consider, whether, if there had been before the date of the deed any such dedication to the general object of the support of public worship, as the relators claim, it would not, according to the decisions in *Pawlet* v. *Clark*, before cited, and in *Brown* v. *Porter*, 10 Mass. 93, have enured to the benefit of the First Parish in Chelmsford, and not of these relators; but the conclusion to which we have come renders its discussion unnecessary.

The Merrimack Manufacturing Company having on the 3d of May 1826 a clear title to the land with the buildings upon it, unincumbered by any trust, or any legal or equitable interest in these relators or others, their deed to the Proprietors of the Locks and Canals conveyed to that corporation a like unincumbered and perfect title; and it remains to consider the effect of the deed of reconveyance executed by the Proprietors of the Locks and Canals on the same day, and as a part of the same transaction. The relators contend that this deed created a base fee in the Merrimack Manufacturing Company, charged with a trust to hold the estate for the use of divine worship and the residence of a minister of the gospel forever. The claim of the respondents is, that it conveyed an estate in fee upon condition subsequent, which could only be divested by a reëntry of the grantor after condition broken; that a release of the condition would make it a fee simple absolute; and that no trust was attached to it.

It is perhaps hardly material to determine whether the clauses in the deed which refer to the appropriation of the land to certain uses, and fix the rights of the parties in case such appropriation should cease, are to be construed as creating a limitation, or a condition, if it should appear that no trust was established; because the deed of release of the Proprietors of the Locks and Canals of May 22d 1830, by which all "the provisions and conditions" in the former deed were released to the respondents, would seem to be clearly sufficient to perfect their title, and to extinguish the interest of the Proprietors of the Locks and Canals, whether that interest were regarded as a right to reënter for breach of a condition, or a possibility of reverter upon the happening of the event which constituted the limitation. And the court are all of the opinion, for reasons substantially like those which have been given in considering the question of dedication, and from a careful examination of the terms of the deed, that no trust was intended by the parties, or constituted by the conveyance. The Proprietors of the Locks and Canals, in their relations to the new community, which became the city of Lowell, and in their objects and motives for providing for the

support of public worship, were substantially the successors of the Merrimack Manufacturing Company. The words "in trust" are not found in the deed, although they are the usual and well known phrase when the creation of a trust is designed; and we think there is nothing in the circumstances or relations of the parties to show that they contemplated a beneficial interest in the estate to be enjoyed by any individual or corporate body, or by the public at large, beyond their own administration and control. And although there are apt words in the deed to create a limitation, and sufficient for that purpose if they stood alone, we think that all its parts taken together do create an estate upon condition, and that by such a construction every portion of the deed is made effective, and its obvious purposes are most completely executed.

The distinction between an estate upon condition, and the limitation by which an estate is determined upon the happening of some event, is, that in the latter case the estate reverts to the grantor, or passes to the person to whom it is granted by limitation over, upon the mere happening of the event upon which it is limited, without any entry or other act; while in the former the reservation can only be made to the grantor or his heirs, and an entry upon breach of the condition is requisite to revest the estate. The provision for reëntry is therefore the distinctive characteristic of an estate upon condition; and when it is found that by any form of expression the grantor has reserved the right, upon the happening of any event, to reënter, and thereby revest in himself his former estate, it may be construed as such. Shep. Touch. 121, 122. Lit. §§ 329, 330. 4 Cruise Dig. tit. 32, *c.* 25. 4 Kent Com. (6th ed.) 125, 126. The words "provided," "so that," and "upon condition that," are the usual words to make a condition; but to say, that if a certain event happen the grantor may reënter, is equally effectual. And the reason of this rule of construction is, that the stipulation for a right of reëntry would be senseless if the deed were construed to create a limitation; because the estate vesting upon the mere happening of the event, the right to enter would of course follow with all other rights of ownership.

The lease of the church, following so soon the deed from the Proprietors of the Locks and Canals, the release of the conditions in that deed by them, the subsequent sale of the church, and the resumption of the use of the parsonage without objection, acquiesced in for so many years, have properly no influence upon the decision of the cause. The intentions of the parties, and the effect of their contracts, must be determined by their acts preceding the written instruments of conveyance, and by applying the legal rules of construction to those instruments. But it is certainly noticeable that the deeds of May 3d 1826, the lease of November 3d 1827, and the release of May 22d 1830, are all executed by Mr. Boott, the original agent of the Merrimack Manufacturing Company, upon whose acts and intentions when acting as their agent so much depends, and who must have known the purposes of the respondents so well. And it is a satisfaction to know, in looking to see whether substantial justice is afforded by the decision of the court, that the conclusions to which we have arrived, and the construction which the law requires us to give to the deeds and contracts before us, are the same which appear to have been understood by all parties in interest to be correct at the time the transactions occurred, and which were acquiesced in and acted upon by them for a period of more than twenty years.

The decree to be entered in this suit must be

*Information dismissed with costs.*