THOMAS J. COLGAN, APPELLANT, v. LEO S. SULLIVAN, RESPONDENT.

Submitted July 7, 1919—Decided March 19, 1920.

1. When the facts in a suit for malicious prosecution are not in dispute, the question whether there was reasonable or probable cause and the defendant actuated by a malicious motive in making the charge is a court question.

2. The plaintiff, in an action for malicious prosecution, must show that the prosecution was instituted without reasonable or probable cause and that the defendant was actuated by a malicious motive in making the charge.

3. The uttering of seditious words is an offence at common law and indictable in this state.

On appeal from the Supreme Court.

For the appellant, *Herbert Clark Gilson.*

For the respondent, *Mark Sullivan.*

The opinion of the court was delivered by

KALISCH, J.  A verdict was directed in the court below for the defendant, in an action brought against him by the plaintiff for malicious prosecution.  Judgment having been entered on the verdict the plaintiff appeals.

The facts are briefly these:  Leo S. Sullivan, the defendant in the court below, made complaint in writing in a magistrate's court of Jersey City, in which complaint Sullivan stated upon information and belief that Thomas J. Colgan, "did utter seditious remarks concerning complainant, he, the complainant, being the chairman of Exemption Board No. 1 in the City of Jersey City, N. J., to wit, he said that complainant had his price, and that he could prove it, and also said that he had the goods on said complainant, and that he also said that said complainant did discriminate between certain persons of the draft age;" whereupon a warrant was issued for Colgan's arrest, which warrant was not served,

Colgan having surrendered himself and given bail. The complainant subsequently withdrew the charge and made a charge of disorderly conduct against Colgan.

The facts are not in dispute. When such is the case the question whether there was reasonable or probable cause and the defendant actuated by a malicious motive in making the charge becomes a court question. *Vladar* v. *Klopman,* 89 *N. J. L.* 575. On behalf of the appellant it is urged that the characterization of the remarks as "seditious" by the complainant in the criminal complaint was a false characterization for which he must be held liable.

To support this contention, counsel of appellant argues that the alleged words did not constitute the crime of sedition or other crime; that the complainant being a lawyer and judge of a criminal court should have known that the words did not violate any criminal statute; that he dictated to the clerk of the court the complaint and demanded a warrant for sedition; that the complainant sought neither the advice of counsel nor did the magistrate designate the crime.

We think, in view of the settled law of this state, that it is of no real importance whether or not the complainant sought the independent advice of a lawyer or relied upon his own legal knowledge of the import of the language used, and dictated the complaint and characterized the language uttered as seditious so long as it appears that the complainant acted in the honest belief at the time he made his complaint that the words uttered were seditious, and submitted the same to a magistrate for his judgment and judicial action.

In *Vladar* v. *Klopman, supra,* Chief Justice Gummere, speaking for this court, at page 576, said: "The fundamental grounds upon which an action for malicious prosecution rests are that it was instituted against the plaintiff without reasonable or probable cause; and that the defendant was actuated by a malicious motive in making the charge. Unless the evidence in the case establishes the existence of both these grounds, the plaintiff's suit must fail."

It is not pretended in the present case that the defendant did not act in good faith, and in the honest belief that the

facts set out in the complaint were true, at the time he made his complaint in the magistrate's court.

The appellant in order to sustain his contention that there was a *prima facie* case of want of probable cause and proof of malicious conduct of defendant relies solely upon his assertion that the defendant falsely characterized the words, alleged to have been uttered by the plaintiff, as seditious, whereas the words were not seditious, in that they did not come within the interdiction of the act of 1918 (*Pamph. L., p.* 130) under the construction given to that statute in *State* v. *Tachin et al.,* 92 *N. J. L.* 269, and affirmed by this court, at the last June term. 93 *Id.* 485.

In this connection counsel of appellant in his brief argues thus: "While it is true that the defendant was informed by Boylan and several of the latter's friends that the plaintiff uttered the words, that evidence did not justify the false characterization of the words as seditious * * * If the words were used they were unlawful in the sense that they were slanderous, but that did not justify the defendant in characterizing the words as seditious. The false characterization of the alleged words virtually amounted to an intentional and false accusation."

The facts of this case clearly distinguish it from *McFadden* v. *Lane,* 71 *N. J. L.* 624, 631, cited by appellant as controlling here, in this respect, that in the case cited the defendant though he knew that McFadden did not steal the crate of tomatoes, nevertheless charged him with having done so in the complaint made in the magistrate's court. It was that posture of the case which led Mr. Justice Pitney to say, at pages 630, 631, in speaking for this court: "It is insisted in this case that the presumption of malice is conclusively rebutted by the fact that the defendant simply laid before the magistrate the facts on which his accusation was based. If Lane had contented himself with charging that McFadden unlawfully took the crate of tomatoes from the freight-house, that question might perhaps be raised. But when he included in his complaint the charge of larceny, he thereby

characterized McFadden's act as something more than a mere unlawful taking, and made himself responsible accordingly."

It is to be noted here, that, in the case referred to, the evidence showed that Lane had apprised himself of all the facts surrounding the taking of the crate of tomatoes from the freight-house by McFadden and, therefore, knew or ought to have known that McFadden did not steal the crate, and consequently the statement by Lane in his complaint that McFadden stole the crate was a willful statement, by the former, of a fact which was untrue.

But an entirely different situation is presented here. The defendant stated in his complaint upon information and belief the language which he was told was uttered by the plaintiff. It is conceded that the defendant received such information. The complaint concluded with a prayer that the plaintiff be dealt with according to law. Nowhere does it appear in the complaint that the plaintiff was charged with a violation of the Sedition act of 1918. Although the remarks were characterized as seditious, this characterization could not have the effect of changing or converting the nature of the remarks into something different from what they indicate, and in this regard the present case differentiates itself in an essential particular from the *McFadden case, supra,* in that, the statement in the complaint that McFadden "did unlawfully take one crate of tomatoes," &c., was materially changed in its character, by adding the statement, "unlawfully did steal, take and carry away."

The uttering of seditious words is an offence at common law. 1 *Bish. New Cr. L.* 457, ¶ 2. The cases cited in a note to the text support this statement. *Re Crowe,* 3 *Cox Cr. Cas.* 123, was a criminal prosecution for seditious utterances. A fairly comprehensive note on this interesting subject containing references to English and American cases is to be found in 25 *Am. & Eng. Encycl. L. (Ed.* 1893) 1008. See 2 *Whart. Cr. L.* (7th ed.), § 2553, under caption, "Seditious Words."

Article ten of the state constitution provides, that the common law and statute laws now in force shall remain in force

*94 N. J. L.* Colgan v. Sullivan.

until they expire by their own limitation, or be altered or repealed by the legislature.

The uttering of seditious language was a common law offence and indictable as such. Hence, by virtue of section 226 of the Crimes act which provides that any attempt to commit a crime indictable at common law shall constitute a misdemeanor, the logical sequence is that the uttering of seditious language is a misdemeanor for which an indictment will lie.

It is clear from the English cases dealing with this important topic that speech, whether oral or written, was seditious when such speech had a tendency to weaken or to hold in contempt government or those entrusted with its administration. The question here is not whether under our form of government and the federal and state constitutions seditious language is indictable, but whether in the general sense of the word "seditious," the language set out in the defendant's complaint was of the character as designated. We think the language was seditious in character. The proof in the case was that a draft board, of which the defendant was chairman, was engaged, in Jersey City, in classifying the men who had been drafted and who were available for service in the military forces of the United States then engaged in war with Germany, into several classes as to the order in which they shall be subject to call for active service.

It seems to us that the words alleged to have been spoken, as disclosed by the evidence, tended to weaken the draft board in the performance of its proper duties and had a tendency to cause dissatisfaction and disturbance among those who were classified by the board and subject to call for immediate service. Such conduct, unchallenged, at a time when we were at war with a formidable enemy might have produced incalculable mischief to the military service, by destroying the spirit and morale of the men who were obliged to go into active service, chafing under the belief that they had been unfairly dealt with by the draft board. Anything done to weaken the spirit of the soldier in the cause in which he is called upon to serve is akin to giving aid to the enemy. As

a consequence we are led to the conclusion that the word "seditious" in the complaint added nothing to the legal effect of the words spoken, or to their meaning other than what results from the import of the words set out.

The judgment is affirmed, with costs.

WHITE, J. (concurring). I agree with so much of the foregoing opinion by Justice Kalisch as holds that the case of *Vladar* v. *Klopman* is here controlling.

I do not, however, think it necessary to decide whether or not the words here used under the circumstances in which they were used, constituted the common law offence of uttering seditious words, nor to decide whether or not such common law offence is a part of the criminal law of this state.

MINTURN, J. (dissenting). I would have no difficulty in acceding to an affirmation of this judgment upon any recognized legal ground not involving a denial of the constitutional right of the citizen, whether in war or peace, to lawfully criticise a public servant.

It is perfectly intelligible to assert that at common law sedition, which is essentially criticism of constituted authority exerted over the people, was unlawful, because class government consisting of a sovereignty known as kings, lords and commons, in which power was conceived to descend by divine right to the king, and from the throne to the classes, and from the aristocracy by a principle of seepage to the people, was consistent with such a theory of *lesé majestie*. But in a constitutionally ordained republic, where all political power is vested in the people, and is imparted only as conceded by the people to their public servants, who are thus dressed in a little brief authority, the crime of sedition can find no place or excuse for recognition; for sedition at common law rose to the dignity of a crime against sovereignty, and did not involve a mere charge of moral turpitude against a local administrative bureau, as is presented by the case at bar. 2 *Bouv.* 974.

The framers of the constitution banished this conception of crime from the land when they defined treason in the constitution, as the only recognized crime against constitutional sovereignty; and upon recognized principles of statutory construction, this specific inclusion of treason excluded any other species of crime, excepting those violations arising under military law and triable before courts-martial. *Inclusio unius est exclusio alterius.*

At common law an office-holder of dignity represented the sovereign; here he represents the people, and instead of assuming the role of governor or administrator, by delegated authority from a sovereignty, he is essentially a public servant, responsible and answerable to his master, the people. Criticism of public servants, therefore, is essentially the right of the people, and guaranteed to them by the express provisions of the constitution.

The constitution (article 1, section 5) provides that *"Every person may fully speak, write or publish his sentiments on all subjects,"* &c. If the framers intended to limit the expression of view to peace times only, it is reasonable to assume they would have so expressed themselves, for they were perfectly inured to and inoculated with the doctrine of sedition, and specified it as one of the grievances, against royalty, in the Declaration of Independence. The effect of the majority opinion, therefore, is to read into the constitution a crime which cannot be found specified there, in the face of the constitutional guarantee, securing the right of free speech to *"every person"* on *"all subjects."* Its further effect is to declare as a part of our constitutional inheritance that when war intervenes the constitutional guarantees are, *ipso facto,* suspended, and this contention is thus interpolated in the constitution without any citation of American authority to support it, but entirely upon a conception of the common law, peculiar to Coke, who antedated the constitution, and who spoke for the class sovereignty, which he represented.

The contention is based upon the theory that we have accepted the common law as part of our legal system, whereas the fact is indubitable that we have not accepted the common

law, except to the extent that it is not inconsistent with our constitution, our public policy, and the spirit and genius of our government; and that the federal government never inherited the system, but must support a criminal prosecution upon the express provisions of the constitution or of some statutory enactment, not inconsistent with its provisions. 1 *Kent Com.* 472; *Van Ness v. Pacard,* 2 *Pet.* (*U. S.*) 137; *Pawlet v. Clark,* 9 *Cranch* 292; *United States v. Wong Kum,* 169 *U. S..649; Smith v. Alabama,* 124 *Id.* 465.

*Argumentum ab inconvenienti,* however, is invoked, and we are informed that liberal criticism by the people of a war and its methods of prosecution may weaken the morale of the troops at the front. If this argument be sound it simply presents a situation which the founders foresaw, and did not deem necessary to provide against. Manifestly we cannot amend the constitution, nor have we the constitutional right to trespass beyond our constitutional jurisdiction, and inject into the fundamental law a conception of public policy not only which the founders thought fit to omit therefrom, but which is diametrically opposed to the express provisions which they incorporated in the document, and the declared public policy upon which this government was founded.

The opinion proceeds upon the theory that there is in this land some super government made up of a superior office-holding class, which has the legal right to prosecute its policies without constitutional or popular restraint, and without adverse criticism during time of war. It thereby inverts the constitutional conception of democratic-republican government, and substitutes the servant in the place of the master; creates a governing class out of a temporary office-holding class, and hedges it about with a dignity and immunity which at common law only surrounded the exalted environment of a king.

If the doctrine of the majority opinion be conceded as applied to the individual, one is inclined to inquire what are its limitations? Is it applicable to legitimate newspaper criticism? Shall the doctrine extend to stifling the criticism of opposing political parties when assembled in convention?

Shall it also extend its policy of enforced silence to the grand juror who in performance of his sworn duty seeks to investigate and expose by indictment, or otherwise, the public malefactor?

Indeed, it becomes manifest that once we unleash from the constitutional moorings we are afloat, not upon unknown seas, but upon seas fraught with danger to the ideals and cherished policies of our democratic institutions.

For these reasons this judgment should be reversed.

*For affirmance*—THE CHANCELLOR, SWAYZE, TRENCHARD, KALISCH, BLACK, WHITE, HEPPENHEIMER, WILLIAMS, TAYLOR, ACKERSON, JJ. 10.

*For reversal*—THE CHIEF JUSTICE, PARKER, BERGEN, MINTURN, JJ. 4.